633 So.2d 147 (1994)
STATE of Louisiana
v.
Sean WILLIAMS.
No. 93-K-2707.
Supreme Court of Louisiana.
March 11, 1994.
*148 Richard P. Ieyoub, Atty. Gen., Harry F. Connick, Dist. Atty., Valentin M. Solino, Asst. Dist. Atty., for applicant.
George A. Guidry, New Orleans, for respondent.
PER CURIAM:[*]
The defendant was charged by grand jury indictment with second degree murder in violation of La.R.S. 14:30.1. After trial by jury, he was found guilty as charged. The trial court thereafter imposed the mandatory penalty of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On appeal, the Fourth Circuit reversed the defendant's conviction and sentence after finding that the evidence did not support the jury's verdict. State v. Williams, 625 So.2d 280 (La.App.1993) (Landrieu, J., dissenting). We granted the state's application to consider whether the Due Process Clause requires setting aside the judgment of the jury on grounds that no rational trier of fact could have reached the same verdict. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). After review of the trial record, we find that the jury reasonably rejected the hypothesis of innocence advanced by the defendant in his own testimony and that the evidence failed to support any other innocent explanation for the victim's death. We therefore reinstate the jury's verdict.
On the afternoon of February 1, 1991, a single gunshot to her head ended the life of Kim Williams, the defendant's wife of only three or four months, in the front yard of their residence on Dale street in New Orleans. According to the state's pathologist, the shot had been fired at a range of no more than six inches and struck the victim squarely between the eyes. The bullet passed "precisely front to back and ended within the skull just at the back of the head." Powder marks from the muzzle discharge surrounded the wound, indicating the proximity of the gun's barrel.
The victim's sister, Shelia Williams, heard the shot in her own residence next door and rushed outside. She found her sister's body sitting upright against a fence in the front yard. Shelia Williams at first saw no one else in the yard but when she turned to call the police, she found a visibly upset defendant approaching her from inside his own home. In the first of four different accounts, the defendant told Shelia that the victim had shot herself. He then informed her that "Nick" had tried to rob them and that when he fired his gun, "Kim got in the way."
While Shelia called the police, the defendant carried his wife's body inside the house. After pulling on a shirt in a back bedroom, the defendant listened for a heartbeat from his wife, then carried her body out to his car and drove to Methodist Hospital. The victim's father, Tommy Williams, testified that while checking on his daughter's condition in the hospital, he spoke with the defendant, who "started hollering and screaming" that he did not shoot the victim and that, "Nick did it. Nick did it." Williams knew Michael "Nick" Taylor as a friend and neighbor. Later that evening, the defendant elaborated to Sergeant John Rice that he had lost control of his own gun in a struggle with Nick and that Nick had then shot his wife before fleeing. Rice recovered the revolver from Tommy Williams, who found the empty weapon in a vacant lot behind the victim's home approximately sixty feet from the residence.
In his trial testimony, the defendant gave his fourth and final account of the shooting. He informed the jurors that the robbery committed by Nick had in fact occurred two days before the shooting. The defendant had then borrowed the revolver from a friend to protect himself and his wife, and was showing the victim how to use the weapon when the fatal shooting occurred. According to the defendant, after his wife complained that she could not work the trigger, he "pulled the little clamp back on the gun for her to make it eas[ier] for her to shoot the gun." They were standing face to face, at arms length, just "playing and clowning" around with the gun, when the victim suddenly *149 announced, "Give me that gun, boy." She reached for the barrel, pulling the revolver from his hand. "That's when the gun had discharged," the defendant testified, "and it fell to the ground." According to the defendant, the gun "wasn't pointed exactly at her at the time ... it shot her on ... the side of her head ... it ain't just shot her straight forward in the face." The defendant testified that he had then rushed the victim to the hospital because he loved his wife. "I wanted to see my wife live," he told the jurors, "because I was really scared." The defendant also informed jurors that Shelia Williams, Tommy Williams, and Sergeant Rice had, for various reasons, misunderstood his attempts to explain how the shooting actually happened.
There were no other eyewitnesses to the shooting and the state failed to produce evidence of marital difficulties or of any other motive for the apparently senseless shooting. Defendant's actions in carrying his wife inside their home and then in driving her to the hospital for treatment tended to underscore that apparent lack of motive. In this context, the appellate court concluded that despite the extent of the defendant's self-contradiction and the self-serving aspects of his trial testimony, the defendant offered "a reasonable hypothesis of the events" negating his specific intent to kill his wife. State v. Williams, 625 So.2d at 282.
Motive is not an essential element of murder, but "a lack of motive may properly be considered as a circumstance mitigating against specific intent." State v. Mart, 352 So.2d 678, 681 (La.1977). Moreover, while the defendant's conflicting explanations of the shooting may have undercut the credibility of his trial testimony, they did not alone constitute affirmative substantive evidence of his specific intent to kill. State v. Savoy, 418 So.2d 547 (La.1982).
The state's case for specific intent homicide rested, however, on more than the inferences arising from the conflicting statements given by the defendant. The prosecution's physical evidence directly contradicted the final, exculpatory account of an accidental shooting offered by the defendant at trial. Compare State v. Savoy, supra. The findings of the pathologist gave jurors a rational basis for concluding that the gun could not have discharged in the way that the defendant described and that considerable, deliberate care had been taken to position the weapon exactly in the center of the victim's forehead and precisely level just before it fired. From that objective evidence, and without any other evidence of his intent but the defendant's discredited version of an accidental shooting, jurors could rationally infer that he fired a bullet through the brain of his victim with the specific intent to kill her. Cf., State v. Williams, 383 So.2d 369 (La. 1980); State v. Procell, 365 So.2d 484 (La. 1978).
In State v. Captville, 448 So.2d 676, 680 (La.1984), this Court explained that "[w]hen a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." In Captville, the state also failed to present any evidence of motive underlying the death of the defendant's wife. This Court nevertheless concluded that "[t]he jury's verdict reflected a reasonable construction of the events of the evening based upon the evidence viewed in the light most favorable to the prosecution." Id., 448 So.2d at 680.
In this case, the state's theory of the case provided jurors a reasonable reconstruction of the events surrounding the victim's death consistent with all of the evidence; that for whatever reason, and no matter how much he had come to regret his actions immediately afterward, the defendant deliberately put a gun to his wife's forehead and shot her at point-blank range with a .38 caliber revolver. By comparison, the defendant's exculpatory account of the shooting appeared so remote and unlikely that it failed to provide jurors a hypothesis of innocence they could not reasonably reject.
The judgment of the Fourth Circuit Court of Appeal is therefore reversed, and the defendant's conviction and sentence are reinstated.
NOTES
[*] LEMMON, J., not on the panel. See Rule IV, Part 2, § 3.