885 So.2d 609 (2004)
STATE of Louisiana
v.
Furnell D. SEVERIN, Jr.
No. 04-KA-326.
Court of Appeal of Louisiana, Fifth Circuit.
September 28, 2004.
*610 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Juliet Clark, Donald A. Rowan, Jr., Assistant District Attorneys, Twenty-Fourth Judicial District Parish of Jefferson, Gretna, LA, for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD, and THOMAS F. DALEY.
THOMAS F. DALEY, Judge.
The defendant, Furnell Severin, Jr., has appealed his convictions of second degree murder and attempted second degree murder, claiming there is insufficient evidence to support the jury's verdict. For the reasons that follow, we affirm.

FACTS:
In the early morning hours of March 30, 2002, defendant, Furnell Severin, went to Mike's Place, a bar at 433 Veterans Boulevard in Kenner. He arrived there with Charley Hollins and Chad Gooden. Defendant was driving Gooden's car, a black 1994 Chevrolet Impala. The group was accompanied by Shawn Moore and Brandon Irving, who arrived together in Irving's white Chevrolet Impala. Both cars were parked at the far side of the parking lot, some distance from the bar's front entrance. Irving testified that they entered the bar shortly after midnight.
Ashley Washington testified that she arrived at Mike's Place between 12:30 and 12:45 a.m. She did not go inside, as she was sixteen years old, and underage. Instead, she waited outside for an older friend who had gone into the bar. She testified that thirty to forty-five minutes after arriving, she saw defendant leave the bar. She further testified that she heard defendant say he was going to get "that thing," because someone in the bar had "pissed him off."
Ashley testified that she saw defendant walk around the side of the building, and return carrying a handgun. Ashley further testified that defendant opened fire in front of the building, shooting at Stanley Norman and his companions. Ashley testified that, after defendant fired his gun, a skinny, dark-skinned man who was with *611 defendant aimed a handgun at the ground and fired.
Ashley testified that she and her friends ran to their car and prepared to leave. They saw Stanley Norman slumped over his car's steering wheel, and stopped to investigate. They discovered he had been shot. Ashley testified that he was bleeding profusely from his chest, and was having difficulty breathing. She testified that she did not see either Stanley Norman or his friends do anything to antagonize defendant.
Terrence Jones testified that he was at Mike's Place with a group of friends, including Stanley Norman. At one point, Jones saw his friends become involved in an altercation with a group of young men. That group included Chad Gooden, whom Jones knew from middle school. Jones also testified that he knew defendant because they had attended Fannie C. Williams Middle School together. Jones was unable to determine how the fight had started, as the loud music in the bar made it impossible for him to hear what the parties were saying. The fight escalated, and one of Jones's friends, Michael Bernard, was hit in the face with a bottle.
Jones testified that he helped Bernard out of the bar, and they walked toward Stanley Norman's car. Jones testified that defendant ran toward him, firing a gun at a distance of about thirty feet. Jones testified that defendant fired at least seven to eight shots. Jones was hit, and fell to the ground. When the shooting stopped, he made his way to Stanley Norman's car. He saw that Stanley Norman was in the driver's seat, slumped over the steering wheel.
Sergeant Richard Mottley of the Kenner Police Department testified that he and Sergeant Emile Sanchez were having breakfast at Rick's Cafe on Loyola Drive, one-half block away from Mike's Place, when a man entered and told them shots had been fired at the bar. The two officers immediately got into their police units and drove to the scene. Sergeant Sanchez alerted Troy Simon, a police radio dispatcher, to the shooting report.
Dispatcher Troy Simon testified that, sometime between 2:00 and 2:30 a.m., he received a telephone call regarding gunshots fired at Mike's Place. He testified that Mike's Place is across the street from police headquarters. Dispatcher Simon went to a window from which he could see the bar. He saw a man in front of Mike's Place raise his hand and fire a gun into a group of about five people. The people fled from the shooter, and two of them fell to the ground. Dispatcher Simon relayed a description of the incident over the police radio.
Officers Patrick Gallagher, Mary McCormick, and Chad Peterson were at the police headquarters when they heard over the radio that shots had been fired at Mike's Place, and that there were subjects down. The three officers immediately responded to the call. Officer Peterson testified that he, Officer Gallagher, and Officer McCormick exited through the rear of the building, and ran toward their police vehicles, but when they looked toward the bar and saw defendant firing a gun into a crowd, they proceeded to the scene on foot. Officer Peterson testified that defendant fired seven to eight shots. The officers shouted at defendant, "Stop, police department, stop." Officer Peterson testified that defendant looked at him and the other officers as they approached, and fired an additional shot. Defendant then got into a car and drove it directly toward the officers.
Officers Peterson and Gallagher opened fire on defendant's vehicle. Defendant turned his vehicle and drove it across *612 the median on Veterans Boulevard, heading eastbound in the westbound lanes. Officer Peterson testified that Sergeant Mottley arrived at the scene in a police vehicle, and he gave Sergeant Mottley a description of defendant and his car. Sergeant Mottley pursued defendant, while Officers Peterson, Gallagher, and McCormick remained at the scene.
Officer Gallagher testified that he located three shooting victims in front of Mike's Place. One, Stanley Norman, was seated in a maroon Oldsmobile, with a gunshot wound to the chest. Another had sustained a gunshot wound to the leg. The third victim had a gunshot wound to the arm. The victims were transported to area hospitals. Stanley Norman was pronounced dead at Kenner Regional Medical Center.
Sergeant Mottley testified that he arrived at the scene just after defendant drove away in his car. Sergeant Mottley followed defendant in his police unit. He testified that defendant continued traveling east on Veterans Boulevard, crossing into the eastbound lanes. Defendant turned right on Williams Boulevard, and Sergeant Mottley followed. Sergeant Mottley pulled defendant over in the 1800 block of Williams. Sergeant Mottley stopped his car behind defendant's vehicle, and used a microphone to instruct defendant to get out of his car. Defendant then drove away at a high rate of speed. Sergeant Mottley testified that he continued to follow defendant. Defendant's tires eventually began to fall apart, and he was forced to stop. When Sergeant Mottley approached the car, defendant was in the driver's seat. There was a man in the front passenger seat, and another in the back seat.
Officer Peterson relocated to Williams Boulevard, where Sergeant Mottley had stopped defendant and his companions. He identified defendant as the shooter. Officer Peterson testified that he advised defendant of his Miranda[1] rights, and then asked defendant whether he wished to waive his rights and make a statement regarding the shootings. Defendant told Officer Peterson there was a fight inside of Mike's Place. Defendant said someone spilled a drink on him, and he (defendant) "capped him."
Detective Brian McGregor testified that he was responsible for the crime scene investigations in the instant case. These included the scene where defendant's car was stopped, Brandon Irving's vehicle, which was found on Airline Highway, where it had been involved in a crash, and the area around Mike's Place. A gun was recovered from the ground next to the Irving car. Both cars were towed to the Kenner Police Department, and were searched pursuant to warrants obtained by Detective McGregor. Numerous projectiles were recovered from defendant's vehicle.
Detective McGregor determined that defendant fired a weapon at the scene. He testified that he recovered a Taurus .9mm handgun in the course of his investigation, and that it was believed to be defendant's gun. According to Detective McGregor, twelve bullet casings found at the scene were matched to the Taurus handgun.
Detective McGregor further testified that the bullet that hit Stanley Norman exited the victim's chest, making it impossible to attempt a ballistics match.[2] Various *613 bullet fragments and pellets recovered from the scene and defendant's vehicle were insufficient to test.
The parties stipulated that, if Captain Louise Walzer were to testify, she would be accepted as a ballistics expert. The parties further stipulated that Captain Walzer would testify that, of the eight pellets recovered from the scene that could be identified through ballistics analysis, four were from Officer Gallagher's gun, and four were from Officer Peterson's gun. It was stipulated that there were nine unknown, unidentified fragments. None of the pellets that were recovered matched the Taurus .9mm pistol, but twelve spent bullet casings matched the Taurus pistol. No spent casings matched State's Exhibit 17, a Bryco .9mm pistol.[3]
Detective Chad Jacquet testified that he conducted a tape recorded interview with defendant. The interview began at 11:07 a.m. on March 30, 2002. The audio tape was played for the jury at trial.
Defendant told Detective Jacquet that he went to Mike's Place with Chad, Charley, Shawn, and Brandon. Defendant drove Chad's car there. Defendant said he drank a fifth of Hennessey before arriving at the bar, and that he had more to drink after he got there. He was intoxicated. Someone in the club hit defendant. He was knocked to the floor, and people wearing red and blue rags kicked him. According to defendant, Charley was also hit.
Defendant further stated that he and Charley exited the bar and went to the car. Shots were fired from among a group of black men outside the bar, and Charley was wounded. Defendant grabbed his pistol from under the driver's seat of Chad's car, and fired it in the direction from which he believed the shots had been fired at Charley. Defendant told Detective Jacquet he did not know whether the people he fired at were those with whom he had fought inside the bar. He said that none of the shots he fired hit anyone.
Defendant stated that he got into Chad's car and drove away, while someone fired a gun at him. Charley and Chad were in the car with him. Defendant continued to drive until he hit something. Defendant said he threw the gun out of the car window, but did not remember where. Defendant told Detective Jacquet he did not intend to kill anyone, and that he fired his gun in response to the gunfire that was directed at him.
Defendant testified at trial, stating that he told Detective Jacquet the truth in the recorded interview. He denied having told Officer Peterson that he had "capped" anyone.
Defendant identified State's Exhibit 16, the Taurus .9 mm handgun, as the one he fired in front of Mike's Place. He testified that he fired his gun at a group of fifteen to twenty people after someone in that group fired at him. He did not see the person who shot at him, as it was dark. Defendant testified that no one was hit when he fired the gun, and that no one fell. He asserted that Stanley Norman was shot before he (defendant) exited the bar. Defendant denied seeing or hearing the police officers who approached him at the scene. He further testified that he did not see or hear Sergeant Mottley attempt to stop him in his car.
*614 Brandon Irving testified for the defense. He stated that he was at Mike's Place with defendant, Furnell Severin, Jr., Shawn Moore, Charley Hollins, and Chad Gooden. The group was involved in a fight inside of the bar. Irving went outside with Moore, and the two men walked to Irving's car. He did not see when defendant left the bar. Irving testified that he heard the sound of gunshots coming from the area in front of the bar. He did not see who fired those shots.
Irving testified that he took his gun out of his car and fired a round into the air then he and his companions drove away from the scene. When he realized defendant was not behind him, Irving turned around and drove back toward Mike's Place. He saw police officers shoot at defendant's car. He thought defendant was probably dead, and left the area. Irving said he was stopped by police for a traffic violation, and that officers told him at that time that he was under investigation for first degree murder and attempted murder. He testified that he was charged with one count of first degree murder and two counts of attempted murder, and that he had pled guilty to illegal use of a weapon.
Irving testified that he gave a statement to police. He said that he told officers he fired into the air, and not toward Mike's Place. But after he was shown his statement to refresh his memory, Irving testified that he told police he fired toward the bar, in the air.
At the conclusion of trial, defendant was found guilty of second degree murder of Stanley Norman and attempted second degree murder of Terrence Jones. Defendant received the mandatory life sentence for second degree murder and fifty years at hard labor for attempted second degree murder. He timely filed this appeal.

LAW AND DISCUSSION:
In his sole specific Assignment of Error, the defendant argues the evidence was insufficient to support the verdict. Specifically, defendant contends that the State failed to prove he fired the shots that killed Stanley Norman and injured Terrence Jones. He suggests the shots were fired by "parties unknown." Defendant further complains the State failed to show that defendant had a motive for shooting the victims, and thus, failed to prove specific intent.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Juluke, 98-0341 (La.1/8/99), 725 So.2d 1291; State v. Williams, 99-223, p. 6 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 607.
When circumstantial evidence forms the basis of a conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Williams, 99-223, at p. 8, 742 So.2d at 608. When circumstantial evidence is used to prove a case, the trial judge must instruct the jury that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438. This statutory test works with the Jackson constitutional sufficiency test to evaluate whether all evidence, direct and circumstantial, is sufficient to prove guilt beyond a reasonable doubt to a rational jury. *615 State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657.
In State v. Mitchell, 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83 (emphasis as found in the original), the Louisiana Supreme Court commented:
On appeal, the reviewing court "does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events." State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012, 1020. Rather, the court must evaluate the evidence in a light most favorable to the state and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. Id.

To prove second degree murder, the State was required to show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A)(1). To sustain a conviction for attempted second degree murder, the State must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. LSA-R.S. 14:27; 14:30.1. Although the statute for the completed crime of second degree murder allows for a conviction based on specific intent to kill or to inflict great bodily harm, attempted second degree murder requires specific intent to kill. State v. Bishop, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437; State v. Zaldivas, 02-0690, pp. 5-6 (La.App. 5 Cir. 12/30/02), 836 So.2d 577, 580-581, writ denied, 03-0705 (La.10/17/03), 855 So.2d 757.
Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Billard, 03-319, p. 5 (La.App. 5 Cir. 7/29/03), 852 So.2d 1069, 1072, writ denied, 03-2437 (La.2/6/04), 865 So.2d 739.
In the case before us, defendant does not dispute that he fired his weapon at the scene. He asserts, however, that so many individuals fired guns at the scene within a brief period of time that it is mere speculation to say he was responsible for shooting Stanley Norman and Terrence Jones. He points out that police were not able, through ballistics testing, to link his gun to the bullets that hit Stanley Norman and Terrence Jones. Contrary to defendant's argument, the State provided a great deal of evidence, both direct and circumstantial, to show that defendant did fire the shots that killed Stanley Norman and injured Terrence Jones.
Ashley Washington testified that she saw defendant leave Mike's Place and walk around the side of the building, out of view. She heard him say that someone in the bar "had pissed him off," and that he was going to get "that thing." Ashley's friend exited the bar and told her that "he" was going to get a gun. Ashley inferred that, by "he," her friend meant defendant. Ashley testified that defendant returned to the bar shortly thereafter, carrying a gun and that defendant "opened fire in front of Mike's Place." She further testified that defendant was shooting at "Stan and his friends." They reacted by attempting to duck and hide.
Ashley testified that when defendant fired his gun, Stanley Norman fell to the ground in back of his car. She testified that Stanley Norman and his friends were going to their car when defendant opened fire. Ashley explained that Stanley Norman and his friends did not do *616 anything to cause defendant to fear for his life, specifically stating that Stanley Norman did not fire a gun.
Ashley testified that she identified defendant in a photographic lineup on April 4, 2002. She also identified defendant in court as the gunman who shot Stanley Norman.
Terrence Jones testified that he was at Mike's Place with some friends, including Stanley Norman. Jones stated that he saw some of his friends become involved in a fight with another group of people inside the bar. He and his friends went outside, where they were shot upon by another group of people. One of Jones's companions was injured, and Jones walked with him toward the parking lot. Jones saw defendant running toward him, shooting at him from a distance of about thirty feet. Jones was hit by a bullet. He fell to the ground, and remained there until the shooting stopped. He then went to Stanley Norman's car, and discovered Stanley Norman had also been shot. Jones testified that he was facing defendant when he fired the gun, but that his friends had their backs to defendant.
Jones testified that he knew defendant prior to the shooting incident, as they had attended Fannie C. Williams Middle School together. Defendant testified he did not know Terrence Jones. He stated he did not attend Fannie C. Williams Middle School, and that he went to school at St. Raphael. In support of defendant's contention, the defense produced a student handbook, a basketball team certificate, a sports banquet program, and a graduation program, all of which show that defendant was a student at St. Raphael during the 1993-1994 school term. Those documents do not, however, exclude the possibility that defendant attended Fannie C. Williams Middle School during some other school term. In any case, Jones identified defendant in a photographic lineup on April 4, 2002 and at trial.
Dispatcher Troy Simon's account of the shooting corroborated the testimony of Ashley Washington and Terrence Jones. When Dispatcher Simon looked at the parking lot of Mike's Place, he saw a man raise his arm, point a gun, and fire into a group of about five people. The people at whom the shooter was firing began to run away from him, while two of them fell to the ground.
Dispatcher Simon broadcast descriptions of the incident and the shooter over the police radio, and several officers immediately responded. Dispatcher Simon saw those officers approach the gunman. Dispatcher Simon then saw the shooter get into a car and drive toward those officers.
Officers Patrick Gallagher, Mary McCormick, and Chad Peterson approached the scene after the victims were shot, but before defendant stopped firing his weapon. Officer Gallagher testified that he arrived to see a black male with long "dreadlocks" firing into a group of people. Officer McCormick testified that she was too far away to identify the shooter by his facial features, but that she could see he had braided hair, and wore black pants and a brownish-beige shirt. Officer Peterson testified that he saw defendant fire a gun into a crowd of people.
Immediately after defendant drove away from the bar, Officer Peterson gave Sergeant Mottley a description of the shooter and his vehicle. Sergeant Mottley followed the vehicle, keeping it in sight until he was able to execute a stop. Sergeant Mottley identified defendant at trial as the person he followed from the bar. After Sergeant Mottley apprehended defendant, Officer Peterson went to the scene of the arrest. Defendant and his two companions were each in separate police cars. *617 Officer Peterson looked at each subject, and identified defendant as the shooter.
Ashley Washington testified that she saw one of defendant's companions (assumedly Irving) fire eight to nine shots toward the ground after defendant fired at Stanley Norman and his friends. Terrence Jones testified he did not hear any other gunshots before defendant fired the shots that hit him and Stanley Norman. Irving testified that he fired one round into the air, in the direction of the bar.
The jury found the accounts of Ashley Washington and Terrence Jones convincing. They both testified that they saw defendant point his gun and fire at Stanley Norman and his friends. Additionally, Officer Peterson identified defendant as the shooter after his car was stopped. Moreover, Officer Peterson testified that defendant told him someone spilled a drink on him in the bar, and he "capped" (i.e., shot) him.
We are aware that at trial defendant denied having made such an admission to Officer Peterson and testified that he shot his gun in self defense and did not strike any one. However, in choosing to believe the testimony of Ashley Washington, Terrence Jones, and Officer Peterson over that of the defendant, the jury made a credibility assessment. This Court cannot assess credibility or reevaluate evidence on appeal. State v. Favorite, 03-425, p. 9 (La.App. 5 Cir. 11/25/03), 862 So.2d 208, 214, writ denied, 03-3529 (La.4/23/04), 870 So.2d 298.
Defendant further argues that the State failed to prove he had the requisite intent to kill or inflict great bodily harm with respect to the murder charge, and that the State did not prove specific intent to kill as to the attempted murder charge. Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from circumstances and actions of the accused, as well as the extent and severity of the victim's injuries. State v. Keating, 00-51, p. 5 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.
Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Robinson, 02-1869, p. 4 (La.4/14/04), 874 So.2d 66, 74; State v. Williams, 01-1650, p. 16 (La.11/1/02), 831 So.2d 835, 849. It is of no consequence whether defendant, in firing his weapon into a group of people, intended to hit one person or several people. In State v. Tyler, 342 So.2d 574 (La.1977), cert. denied, 431 U.S. 917, 97 S.Ct. 2180, 53 L.Ed.2d 227 (1977), the defendant was convicted of first degree murder after firing a gun into a crowd. The Supreme Court found that the jurisprudence supported the proposition that shooting into a crowd indiscriminately with intent to kill someone was an assault with intent to kill each of them. See also, State v. Neal, 00-0674 at p. 10, 796 So.2d at 657 ("clearly an offender who uses a high powered assault rifle and shoots indiscriminately through a door at a group of people specifically intends to kill the victims")[.] We find that the testimony elicited at trial that the defendant fired his gun into a crowd of people is sufficient to satisfy the intent requirement of this statute.
Defendant then argues that the State failed to establish a motive. Motive is not an element of second degree murder or attempted second degree murder under LSA-R.S. 14:30.1 or LSA-R.S. 14:27. However, the Louisiana Supreme Court *618 has explained that absence of proof of motive "`may properly be considered as a circumstance mitigating against specific intent.'" State v. Williams, 93-2707, p. 4 (La.3/11/94), 633 So.2d 147, 149 (quoting State v. Mart, 352 So.2d 678, 681 (La.1977)).
Officer Peterson's testimony that defendant stated that someone in the bar had spilled a drink on him, and that he had "capped" that person, suggests a motive for the shootings. Ashley Washington testified that, as defendant left the bar to retrieve his gun, she heard him say that someone inside the bar had "pissed him off." Additionally, defendant also testified at trial that he and his friends became involved in an altercation inside of Mike's Place. This also suggests a motive for defendant to shoot into the crowd.
After a review of the evidence based on the standard enunciated in Jackson v. Virginia, we find the State provided sufficient proof for a rational trier of fact to find the defendant guilty of second degree murder and attempted second degree murder beyond a reasonable doubt.

ERRORS PATENT DISCUSSION
The record was reviewed for errors patent. LSA-C.Cr.P. art. 920: State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors in this case.

CONCLUSION:
For the foregoing reasons, the defendant's convictions are affirmed.
AFFIRMED.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The parties stipulated at trial that, if Dr. Susan Garcia, Deputy Coroner with the Jefferson Parish Coroner's Office, were to testify, she would say that Stanley Norman died as a result of a gunshot wound to the back, and that no pellet was recovered from the body.
[3] This gun was apparently the gun found next to Brandon Irving's car. The State introduced it in evidence at the time of the stipulation.