# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-505

**STATE OF LOUISIANA**

**VERSUS**

**JARRETT ANDREWS**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. CR 80477
HONORABLE KRISTIAN DENNIS EARLES, DISTRICT JUDGE

**********

**D. KENT SAVOIE**
**JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and D. Kent Savoie, Judges.

**AFFIRMED.**

**Annette Fuller Roach**
**Louisiana Appellate Project**
**Post Office Box 1747**
**Lake Charles, Louisiana 70602-1747**
**(337) 436-2900**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Jarrett Andrews**

**Hon. Keith A. Stutes**
**District Attorney**
**Fifteenth Judicial District Court**
**Post Office Box 3306**
**Lafayette, Louisiana 70502-3306**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Burleigh G. Doga**
**Assistant District Attorney**
**Fifteenth Judicial District Court**
**Post Office Box 288**
**Crowley, Louisiana 70527-0288**
**(337) 788-8831**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**SAVOIE, Judge.**

Defendant, Jarrett Andrews, was charged by indictment filed on March 12, 2013, with second degree murder, a violation of La.R.S. 14:30.1. Trial by jury commenced on October 10, 2017, and Defendant was found guilty as charged on October 11, 2017. Sentencing was held on October 16, 2017, and Defendant received a sentence of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant orally moved for reconsideration of his sentence, which was denied. A written motion to reconsider was filed on October 25, 2017, and was found moot on November 9, 2017. A motion for appeal and designation of record was filed on November 13, 2017, which was subsequently granted.

Defendant is now before this court asserting that the evidence is insufficient to support his conviction for second degree murder. For the following reasons, we affirm.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by for errors patent on the face of the record. After reviewing the record, we find no errors patent present.

## ASSIGNMENT OF ERROR

Defendant was convicted of the October 13, 2012 killing of Nathaniel Wiltz. In his only assignment of error, Defendant contends the State failed to prove that he had the specific intent to kill Wiltz, which is required to satisfy the elements of second degree murder and manslaughter. Defendant argues that Wiltz's death was caused by the careless handling of a firearm and constituted negligent homicide.

Thus, it is his contention that this court should enter a verdict of negligent homicide and remand the matter for resentencing.

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86

Second degree murder, a violation of La.R.S. 14:30.1(A)(1), is the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Bishop*, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437.

The State called four witnesses to prove its case against Defendant. The first witness was Dr. Terry Welke, who was accepted as an expert in forensic pathology. Dr. Welke performed an autopsy on Wiltz on October 15, 2012. Wiltz was five feet ten inches tall and weighed 178 pounds. Wiltz had scrapes above the left eyebrow and on the right side of the chest and had been shot four times. There were four entrance wounds and one exit wound on Wiltz's body. The entrance

wounds were located below the left collarbone, in the back of the neck, and on the left outer back. There was another entrance wound to the back of the left shoulder and an exit wound at the top of the shoulder. The wound to the neck caused injuries to the head and brain, and the wound to the left back caused a broken rib and went through the lung, as well as the aorta. There was no gun powder residue present on Wiltz's body. Dr. Welke recovered three small caliber bullets from Wiltz's body that he thought were consistent with a .22 caliber bullet. There were no illicit drugs or alcohol in Wiltz's system.

Dr. Welke was questioned about the gunshot wounds as follows:

Q. Okay. If you're presented, hypothetically, with some situation where someone says that the gunshots or gunshot wounds were caused, at least once, by a gun discharging while in that person's pocket; based upon that . . .

. . . .

Q. Is that consistent with your findings in this report?

A. No.

Q. Okay. And if another allegation is that, hypothetically, is that a gun discharged either one (1) or more times as a result of dropping it on the ground, is that consistent with your findings of the entrance and at least one (1) exit wound?

A. No, sir.

Referring to his report, Dr. Welke testified that the trajectory of the gunshot to the back of the neck was "'from back to front and upwards with no significant left/right deviation.'" In addressing the shot to the left collarbone, Dr. Welke stated the "'trajectory [was] from right to left, front to back and slightly upwards.'" The trajectory of the wound to the left outer back was "'back to front, left to right, and upwards.'" The trajectory of the shot to the left outer shoulder was "'from left to right, and upwards with no significant front/back deviation.'"

The autopsy report listed a three-quarter inch scrape on the left forehead and a one-fourth inch abrasion on the right outer chest. The injuries were not healing, so Dr. Welke stated he "imagine[d]" they occurred "sometime just prior to death." He did not know if they occurred prior to or after the gunshot wounds.

Brandy Miller lived at the Kennedy Apartments in Iota, Louisiana. At approximately 4:00 or 5:00 on October 13, 2012, she heard what she thought were fireworks. Miller opened her door quickly and spoke to some boys who were playing, but they were not making the noise. She then described what she saw at Merdina Ledet's apartment: "I saw a man across from us, our apartment, laying on the sidewalk by the front door. And another man running in and then running out and then speeding off." Miller saw Merdina over the man on the sidewalk shaking him, crying, and screaming for him to wake up. The man who was running went into the apartment for a few seconds, came back out, got into Merdina's car, and drove off. Miller described him as a "short to medium size black man." Miller identified Defendant as the man she saw running.

Detective Dennis Fruge testified that Wiltz was found just outside the front door of the apartment to which he had been dispatched. Four .22 caliber shell casings were found inside the front room of the residence. However, no gun was found at the location.

Detective Fruge indicated that Defendant was arrested on October 13, 2012, and was interviewed by him after Defendant was advised of and waived his rights. During that interview, Defendant admitted that he shot Wiltz. Detective Fruge testified that Defendant said, "He shot him once in the arm, and then when Mr. Wiltz was running out of the apartment he shot him again when he fell down, the pistol went off." Defendant did not state that Wiltz attacked him; he did not reveal

that either he or Wiltz were under the influence of drugs or alcohol;  nor did he claim that someone else shot Wiltz.  There were no allegations of a physical altercation.  Defendant referred to the victim as "Trevon."[1]

In his interview with Detective Fruge, Defendant stated that he had a child with Merdina, and Wiltz had a child with Micha.[2]  Defendant was questioned by Detective Fruge as follows:

> J.A.  I MEAN LIKE THIS AFTERNOON IT WAS LIKE, LIKE EVERYBODY WAS OVER THERE LIKE WE WAS [sic] FUSSING.

> D.F.  WHERE, WHO'S EVERYBODY AND WHERE YOU WERE?

> J.A.  ME, TRAVON, MICHA AND MY BABY MAMA, UH, WAS [sic] LIKE TO HER HOUSE.

> . . . .

> J.A.  AND LIKE WE WAS [sic] ALL, IT WAS LIKE WE GOT INTO IT EARLIER THAT DAY SO, ME AND TRAVON WENT OVER THERE I QUESTIONED THEM TWO ABOUT ALL KIND OF STUFF.  ME AND HIM, ME AND HIM HIS BABY MAMA, MY BABY MAMA WE WAS [sic] ALL FUSSING SHE WAS LIKE.  YOU KNOW WHAT I'M SAYING LET ME TAKE THE KIDS THEY SHOULDN'T BE AROUND ALL THIS I WAS LIKE NO THE KIDS GONNA [sic] STAY OVER HERE AND SHE SAID JARRETT JUST PLEASE LET ME TAKE THE KIDS AND STUFF LIKE THAT SO.

> . . . .

> D.F.  WHAT WERE YA'LL FUSSING ABOUT BUDDY?

> J.A.  I DON'T KNOW WE WAS [sic] FUSSING ABOUT ALL KIND OF STUFF LIKE WE ALL WAS [sic] FUSSING. THEN, ME AND MY BABY MAMA WAS [sic] FUSSING, THEN TRAVON AND HIS BABY MAMA WAS [sic]

[1]In Defendant's statement to police, the name is spelled Travon.

[2]The transcript of the statement refers to Merdina as Madina.  Additionally, appellate counsel refers to Micha as Timesha Guy in her brief to this court.

5

FUSSING AND STUFF LIKE THAT AND THEN, MICHA WAS LIKE LET ME TAKE THE KIDS BECAUSE THEY DON'T NEED TO BE AROUND ALL THIS AND I WAS LIKE NAW [sic].  THE KIDS GONNA [sic] STAY OVER HERE.  AND SHE WAS LIKE JARRETT LIKE SHE KEPT SAYING JARRETT PLEASE LET ME TAKE THE KIDS AND I CAN JUST BRING THEM BACK TO MY HOUSE.  I SAID NO THE KIDS NOT [sic] GOING NO WHERE [sic] THEY GONNA [sic] STAY OVER HERE WITH ME CAUSE [sic] I HAD MY DAUGHTER OVER THERE AND MY BABY MAMA SON ON THE SIDE.  HE WAS THERE I JUST KEPT ON AND SO MICHA GOT MAD AT TRAVON AND SHE LEFT SO, YOU KNOW THEN ME AND TRAVON AND MY BABY MAMA WAS [sic] ARGUING AND THEN, LIKE WE WAS [sic] IN THE ROOM.

. . . .

JA.    YEAH, WE WAS [sic] ARGUING AND LOOK I HAD MY DAUGHTER IN MY HAND AND I PUT HER ON THE BED AND WE STILL [sic] ARGUING AND TRAVON WENT TO THE BATHROOM.  I WAS LIKE COME ON OUT JUST TELL THE TRUTH AND ALL KIND OF OTHER SHIT LIKE THAT AND LIKE THE GUN THE TRIGGER IS LIGHT, LIKE YOU PUT IT'S [sic] LIGHT.  I MEAN AND I WAS FUSSING I WAS YOU KNOW WHEN YOU SWING YOUR HANDS AND POINT YOUR HANDS LIKE THAT YOU KNOW WHAT I'M TALKING ABOUT LIKE THIS.

. . . .

J.A.    AND YOU KNOW WHAT I'M SAYING I HIT THE TRIGGER IT HIT HIM IN THE ARM.

. . . .

J.A.    HE RAN YOU KNOW WHAT I'M SAYING I BELIEVE I GUESS HE WAS SCARED CAUSE [sic] HE THOUGHT I SHOT HIM AND LIKE I WAS REALLY AIMING TO SHOOT HIM BUT, I WASN'T LOOKING AT HIM.  CAUSE [sic], CAUSE [sic] IF HOW I CAN'T ………I KNOW I SHOT HIM LIKE WHEN I SEEN [sic] HIM HE SAID OW, HE GRABBED HIS ARM LIKE THIS.

D.F.    WHERE WERE Y'ALL AT WHENEVER THE GUN WENT OFF?

J.A.    LIKE, UH, IN THE BEDROOM.

6

D.F.   WHICH ONE?

J.A.   IN THE BACK LIKE HE WAS TOWARDS LIKE HE WAS BY THE BATHROOM.

. . . .

J.A.   AND ME AND MY BABY MAMA WAS [sic] IN THE ROOM FUSSING I JUST PUT MY DAUGHTER DOWN AND THEN YOU KNOW WHAT I'M SAYING I WAS POINTING LIKE THAT I AIN'T, I AIN'T [sic] AIMED AT HIM.  CAUSE [sic] IF, IF I WAS GONNA [sic] AIM AT HIM IT WAS [sic] BE LIKE YOU KNOW WHAT I'M SAYING I WOULD HIT HIM DIRECTLY IN THE CHEST ……….

D.F.   RIGHT YOU CLOSE ENOUGH …………

J.A.   ………….. TO POINT AND LIKE I SAID I WAS POINTING AND IT HIT HIM IN THE ARM HE GRABBED HIS ARM. HE START [sic] RUNNING I RAN AFTER HIM YOU KNOW WHAT I'M SAYING HE WAS IT [sic] SHOT HIM.

. . . .

J.A.   AND I RAN THE GUN OBVISOULY [sic] HIT ME IN MY KNEE CAUSE [sic] I HAD IT IN MY POCKET CAUSE [sic] AND THE SAFETY WASN'T ON IT BECAUSE THEY GOT [sic] A SAFETY ON IT.  SO, I HIT HIM IN THE BACK I THINK IT HIT HIM IN THE BACK I DON'T KNOW AND THEN IT FELL ON THE FLOOR IT WENT OFF AGAIN AND HE FELL SO, I WAS SHOCKED I RAN TO HIM………..

D.F.   WHERE DID HE FALL AT?

J.A.   OUTSIDE.

. . . .

J.A.   I RAN TO HIM I SAID TRAVON, I SAID MADINA  [sic] PLEASE SOMEBODY CALL THE UH, THE AMBULANCE SHE WAS LIKE JARRETT JUST GO I SAID TRAVON MAN COME ON AND SHE SAID JARRETT JUST GO SO, I PANIC. I GUESS SHE WAS SCARED TOO SO I LEFT AND UH, THEN I TRIED TO CALL EVERYBODY I TRIED TO CALL HER I TRIED TO CALL HER MAMA, I TRIED TO CALL A COUSIN, I CALLED I TRIED TO CALL HER BROTHER WHATEVER. YOU KNOW WHAT I'M SAYING JUST TO SEE IF HER [sic] WAS ALRIGHT.

7

Defendant's interview continued, and he stated, "I JUST DONE SOMETHING I DIDN'T MEAN TO DO." Defendant spoke to Merdina's brother by phone and told him, "I'M NOT LOOKING TO KILL NOBODY I'M AIN'T WANT [sic] I DIDN'T MEAN TO DO THAT IT WAS AN ACCIDENT I DIDN'T MEAN TO JUST GUN HIM DOWN LIKE, LIKE SHE WAS SAYING I WAS DOING RIDING AROUND JUST LOOKING FOR PEOPLE TO KILL NO, IT WAS NOTHING LIKE THAT." Defendant then communicated with Merdina via text and learned Wiltz died. He responded, "OH MY FUCKIN [sic] GOD YOU SERIOUS AND SHE SAID YEAH, SHE SAID I CAN'T BELIEVE THIS I WAS LIKE OH MY GOD, I SAT THERE CRYING FOR THE LONGEST CAUSE [sic], I AIN'T [sic] MEAN TO DO THAT AT ALL." Defendant met his brother and some friends, and they told him to turn himself in.

Defendant was again questioned regarding his argument with Wiltz:

D.F. SO, SO WHAT WAS THE ARGUMENT OVER THAT ORIGINALLY STARTED THIS?

J.A. I DON'T KNOW I WAS, I WAS REALLY I THINK THEY WERE FUSSING BECAUSE I THINK TRAVON HAD SLEPT WITH MY BABY MAMA OR SOMETHING LIKE THAT AND WE WAS [sic] ALL FUSSING ABOUT THAT SO. THAT'S HOW IT ALL STARTED.

Defendant was asked how many shots he fired, and he responded:

J.A. THE ONE I TOLD YOU THAT I ACCIDENTALLY DID IN HIS ARM.

. . . .

J.A. AND THEN I TOLD YOU THE ONE IT'S LIKE, IT, IT THE GUN IS MESSED UP A LIL [sic] BIT.

. . . .

J.A. CAUSE IT BE JAMMING [sic] AND STUFF AND IF YOU HIT IT TO HARD LIKE IT GO [sic] OFF AND IT HIT MY

8

KNEE I WAS RUNNING AFTER HIM HE THOUGHT I KNEW HE WAS SCARED OBSIVELY [sic] HE WAS SCARED. HE THOUGHT I WAS TRYING TO SHOOT HIM AGAIN.

. . . .

J.A.  NO, IT HIT ON MY KNEE,…………IT WENT OFF IT FELL ON THE FLOOR CAUSE [sic] MY POCKETS I HAD SOME UH, SOME OTHER SHORTS ON IT WAS LIKE SOME REAL SHORTS AND IT'S LIKE MY POCKETS IS [sic] LOOSE AND FELL OUT HIT THE FLOOR IT WENT OFF AND THEN AFTER THAT HE FELL. THAT'S WHEN I WENT TO HIM I SAID COME ON MAN I SAID TRAVON I FLIP [sic] HIM OVER I SEEN [sic] HE A LIL [sic] BLOOD RIGHT HERE YOU KNOW WHAT I'M SAYING. HIS EYES WERE OPEN HE STILL WAS ALIVE I SAID TRAVON MAN TRAVON I WAS LIKE SOMEBODY CALL THE AMBULANCE THEN, THAT'S WHEN MY BABY'S MAMA TOLD ME TO GO JUST GO AND I PANIC [sic] SO I LEFT.

Defendant again professed he did not intentionally shoot Wiltz.

Defendant was further questioned as follows:

D.F.  WHO SEEN [sic] YOU, WHO SEEN [sic] YOU SHOOT HIM?

J.A.  NOBODY I WAS TALKING LIKE MY BABY MAMA RIGHT HERE AND I WAS LOOKING AT HER AND LIKE YOU IN THE HALL JUST LIKE THIS…….

. . . .

J.A.  AND I POINTED …………AND IT WENT OFF SOON AS IT WENT OFF I LOOKED DIRECTLY OVER THERE HE GRABBED HIS ARM HE TOOK OFF RUNNING I RAN DIRECTLY AFTER HIM. I MEAN HE WAS SCARED OBSIVELY [sic] HE WAS SCARED HE MUST OF THOUGHT I WAS GONNA [sic] TRY AND SHOOT HIM AGAIN IT WASN'T NOTHING [sic] LIKE THAT.

D.F.  OKAY, SO IT WASN'T LIKE YOU WAS [sic]. YOU WAS [sic] AFTER HIM IT WAS GONNA [sic] BE…………………

J.A.  NO IT WASN'T LIKE THAT BECAUSE, IF IT WAS ALL THAT WHY DO IT IN FRONT OF PEOPLE IN FRONT OF MY KIDS IN THE HOUSE.

9

Detective Fruge told Defendant that the argument with Wiltz occurred because Wiltz was sleeping with Merdina, and Defendant stated, "THEY SAID THEY SLEPT WITH EACH OTHER." Defendant then stated, "I DON'T KNOW HOW TRUE IT IS I DON'T EVEN KNOW I WAS JUST UPSET ABOUT IT I WAS MAD THAT'S IT. LIKE ANYBODY LIKE I TOLD HIM I SAID IF YOU DID IT HOW WOULD YOU FEEL IF I SLEPT WITH YOUR BABY MAMA?"

Detective Fruge agreed that Defendant was "sort of blaming the gun and not saying, 'I shot Trevon[.]'" Defendant turned himself in and gave his weapon to police. Defendant told Detective Fruge that the gun went off in the bedroom. However, no shell casings were found there.

Corporal Dustin Lopez testified that he secured a Smith & Wesson .22 caliber handgun and a magazine after Defendant was arrested. At that time, there was one live round in the chamber, and the magazine was empty.

On appeal, Defendant argues that the State failed to present evidence that he planned to kill Wiltz, that he threatened Wiltz in any way, or that there was past animosity between the two. Defendant contends he became increasingly agitated during the argument about Wiltz sleeping with Merdina and that he was not acting rationally during the time the shooting occurred. Moreover, he asserts that the State failed to prove he had the specific intent to kill Wiltz, and Defendant claims the shooting was the result of his improper and careless handling of a pistol which had a "light trigger." He claims the gun accidentally discharged as he was swinging it around during an increasingly heated argument, causing him to lose his composure and reasoning as his friend reacted to the shot. He asserts that the careless handling of the gun amounted to a gross deviation below the standard of

10

care expected to be maintained by a reasonably careful man under like circumstances. Thus, he concludes that his conduct constituted negligent homicide.

Second Degree Murder

Defendant was convicted of second degree murder and alleges that the State did not prove he had the specific intent to kill Wiltz. He claims the shooting was accidental. In *State v. Williams*, 93-2707 (La. 3/11/94), 633 So.2d 147 (per curiam), the supreme court found defendant's account of an accidental shooting "so remote and unlikely that it failed to provide jurors a hypothesis of innocence they could not reasonably reject." *Id.* at 149. Williams and his wife, the victim, were alone outside, when the shooting occurred. Defendant testified that, because they had been robbed two days prior to the incident, he had borrowed a gun and was showing his wife how to use the gun when it accidently discharged. The bullet struck the victim square in the forehead, right between her eyes. Between the time Williams first talked to the police and the time he was charged with second degree murder, he gave three different accounts of how the shooting occurred. In addressing the sufficiency of the evidence, the supreme court stated:

> The state's case for specific intent homicide rested, however, on more than the inferences arising from the conflicting statements given by the defendant. The prosecution's physical evidence directly contradicted the final exculpatory account of an accidental shooting offered by the defendant at trial. *Compare State v. Savoy*, [418 So.2d 547 (La.1982)]. The findings of the pathologist gave jurors a rational basis for concluding that the gun could not have discharged in the way that the defendant described and that considerable, deliberate care had been taken to position the weapon exactly in the center of the victim's forehead and precisely level just before it fired. From that objective evidence, and without any other evidence of his intent but the defendant's discredited version of an accidental shooting, jurors could rationally infer that he fired a bullet through the brain of his victim with the specific intent to kill her. *Cf., State v. Williams*, 383 So.2d 369 (La.1980); *State v. Procell*, 365 So.2d 484 (La.1978).

11

*Id.*

> "The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill." *State v. Gonzalez*, 07–449, p. 8 (La.App. 5 Cir. 12/27/07), 975 So.2d at 8, *writ denied*, 08–0228 (La.9/19/08), 992 So.2d 949. Moreover, specific intent to kill can be inferred from the intentional use of a deadly weapon, such as a knife or a gun, *State v. Knight*, 09–359, p. 14 (La.App. 5 Cir. 2/9/10), 34 So.3d 307, 317, from the circumstances and the defendant's actions, and the extent and severity of the victim's injuries. *State v. Graves*, 99–113, p. 3 (La.App. 5 Cir. 8/31/99), 740 So.2d 814, 816, *writ denied*, 99–3013 (La.3/31/00), 759 So.2d 68. Whether a defendant possessed the requisite intent in a criminal case is a question for the trier-of-fact, and a review of the correctness of this determination is guided by the *Jackson* standard. *Gonzalez*, 07–449 at 9, 975 So.2d at pp. 3, 8.

*State v. Patterson*, 10-415, pp. 10-11 (La.App. 5 Cir. 1/11/11), 63 So.3d 140, 148, *writ denied*, 11-338 (La. 6/17/11), 63 So.3d 1037.

The jury heard Defendant's version of the events. He told Detective Fruge that he did not intentionally shoot Wiltz, and the gun went off three times. However, Wiltz was shot four times. Defendant said Wiltz was shot in the arm, then he ran, and Defendant ran after him. However, the only entrance wound to the front of Wiltz's body was located under the left collar bone. Defendant additionally told Detective Fruge that the gun first went off in the bedroom, but all four shell casings were recovered in the front room of the apartment. Moreover, Dr. Welke testified that Wiltz's wounds were inconsistent with a gun discharging while in a person's pocket or upon being dropped on the floor. The verdict clearly indicates that the jury made a credibility determination and rejected Defendant's version of the events. That credibility determination cannot be second-guessed by this court.

Given the evidence produced at trial, the jury could have reasonably inferred that Defendant had the specific intent to kill Wiltz, especially in light of the fact

that he was shot four times. Inferences of specific intent to kill were found to support the verdicts in *Patterson*, 63 So.3d 140, and *State v. Dixon*, 620 So.2d 904 (La.App. 1 Cir. 1993). In *Patterson*, defendant shot the victim five times, and in *Dixon*, defendant fired three shots at the victim at fairly close range and struck her once in the chest and once in the back.

Based on the reasons set forth herein, we find that the State presented sufficient evidence to prove the elements of second degree murder.

Manslaughter

Defendant also argues that the evidence was not sufficient to support a verdict of manslaughter. Manslaughter is a responsive verdict to second degree murder. La.Code Crim.P. art. 814(A)(3).

> Manslaughter is a homicide which would be either first or second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La.R.S. 14:31(1). Thus, the presence of "sudden passion" or "heat of blood" distinguishes manslaughter from murder. The court has stated on several occasions, however, that "sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed without them. *State v. Tompkins*, 403 So.2d 644 (La.1981); *State v. Temple*, 394 So.2d 259 (La.1981); *State v. Peterson*, 290 So.2d 307 (La.1974). Since they are mitigatory factors, a defendant who establishes by a preponderance of the evidence that he acted in a "sudden passion" or "heat of blood" is entitled to a manslaughter verdict. Where such proof has been introduced, a second degree murder verdict is inappropriate.

*State v. Lombard*, 486 So.2d 106, 110-11 (La.1986) (footnotes omitted).

Defendant did not demonstrate that he was provoked by Wiltz. While Defendant was arguing with Wiltz, "arguments do not suffice to reduce a murder to manslaughter." *State v. Vercher*, 14-1211, p. 10 (La.App. 3 Cir. 5/6/15), 162 So.3d 740, 746, *writ denied*, 15-1124 (La. 5/20/16), 191 So.3d 1065. *See also*

*State v. Charles*, 00-1611 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420.  Furthermore, Defendant informed Detective Fruge that the argument had been ongoing for some time before Defendant shot Wiltz.  Clearly, the jury concluded that this homicide was not committed in sudden passion or heat of blood immediately caused by provocation to deprive an average person of his self-control.

Negligent Homicide

The Defendant contends that this court should vacate his conviction and enter a verdict of negligent homicide, which is also a responsive verdict to second degree murder.  La.Code Crim.P. art. 814(A)(3).  Negligent homicide is the "killing of a human being by criminal negligence."  La.R.S. 14:32.

> Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such a disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful person under like circumstances.

La.R.S. 14:12.

> The offense of negligent homicide is not an intentional crime and intent is not an element of negligent homicide. *State v. Guillot*, 277 So.2d 146 (La.1973).

> Jurisprudence shows that the common element in negligent homicide cases involving firearms is a finding that a defendant acted in an unreasonably dangerous or unsafe manner at the time of the discharge of his weapon.  Evidence of negligent homicide was found to be sufficient in *State v. McFerson*, 583 So.2d 516, (La.App. 3rd Cir.) *writ denied*, 588 So.2d 113 (La.1991), where it was determined that the defendant acted below the standard of care expected to be maintained by reasonably careful persons under similar circumstances when he brought a loaded gun into a bar, pulled the gun out of his pants pocket, and the gun discharged killing an innocent victim.

> Similarly, in *State v. Barberousse*, 458 So.2d 569, (La.App. 3rd Cir.1984) *aff'd*, 480 So.2d 273 (La.1985), a defendant was found criminally negligent when he fatally shot his sister when he pulled out a loaded .38 caliber revolver, cocked it and pointed it at another

14

person, supposedly to frighten that person. The gun discharged, with the bullet striking defendant's sister in the chest and fatally wounding her. The courts have also found evidence sufficient in a case wherein the shooter was purportedly under duress when he fired his weapon. In *State v. Parker*, 431 So.2d 114 (La.App. 1st Cir.), *writ denied* 435 So.2d 433 (La.1983), the defendant was found guilty of negligent homicide even though the evidence indicated that he may have been harassed and fearful at the time of the shooting. Evidence indicated that the defendant shot through his door without first determining who was outside and while knowing that other members of his residence were not in the home, but expected to return to the residence.

*State v. Desoto*, 07-1804, pp. 8-9 (La. 3/17/09), 6 So.3d 141, 147.

In his statement to Detective Fruge, Defendant said that "the gun [was] messed up a [little] bit," had a light trigger, and accidentally discharged three times. The jury heard testimony regarding Defendant's version of the events and were given copies of a transcript of Defendant's interview with Detective Fruge for their review. The jury chose to reject Defendant's version of the events, as previously noted. Accordingly, we find no merit to Defendant's argument that we should vacate the jury's findings and find him guilty of negligent homicide.

Viewing the evidence in a light most favorable to the prosecution, we find that there is sufficient evidence to find Defendant had the specific intent to kill Wiltz, supporting Defendant's conviction for second degree murder. Accordingly, Defendant's assignment of error lacks merit.

## DECREE

The Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

15