900 So.2d 95 (2005)
STATE of Louisiana
v.
GLEN J. BARBARIN.
Nos. 04-KA-1094, 04-KA-1095.
Court of Appeal of Louisiana, Fifth Circuit.
March 1, 2005.
*96 Charles C. Foti, Jr., Attorney General, Kristi Deason Hagood, Assistant Attorney General, Baton Rouge, LA, for Plaintiff/Appellee.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., SOL GOTHARD and WALTER J. ROTHSCHILD.
EDWARD A. DUFRESNE, JR., Chief Judge.
Defendant, Glen Barbarin, was charged by grand jury indictment with two counts of first degree murder, in violation of LSA-R.S. 14:30, and one count of attempted first degree murder, in violation of LSA-R.S. 14:27 and 14:30. The state subsequently amended the charges against defendant to reflect two counts of second degree murder, LSA-R.S. 14:30.1, and one count of attempted second degree murder, LSA-R.S. 14:27 and 14:30.1.
*97 The amended charges proceeded to trial before a twelve person jury. After considering the evidence presented, the jury returned verdicts of guilty as charged on all three counts. Defendant thereafter filed motions for new trial and for a post-verdict judgment of acquittal which were denied by the trial judge. After defendant waived delays, the trial judge sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on both counts of second degree murder. The judge also sentenced defendant to forty-five years of imprisonment at hard labor without benefit of parole, probation, or suspension of sentence for attempted second degree murder, with all three sentences to be served concurrently. Defendant now appeals, challenging the sufficiency of the evidence used to convict him.

FACTS
In the early morning hours of August 29, 2002, Christopher Robert, Craig Robinson, and Carl Kieff sustained gunshot wounds after defendant fired multiple shots from a .40 caliber handgun. Robert and Robinson died as a result of their injuries, but Kieff lived after spending several days in the hospital.
At trial, Peter Sanchez testified that he and Robert went to Sharkey's Pool Hall located on Behrman Highway at approximately 11:00 p.m. on August 28, 2002 to play pool. They left between 3:40 and 3:45 a.m., but returned shortly thereafter when Robert realized that he did not have his cell phone. Sanchez stayed in the car while Robert went inside Sharkey's to look for the phone. A few minutes later, Robert told Sanchez to come inside. Sanchez observed three men, later identified as defendant, Tory Tremell and Zachary Aaron, playing pool at the table where Sanchez and Robert had been playing. Sanchez asked the three men if they had seen a cell phone, and they replied negatively. However, Robert believed that the men had taken his phone and insisted that the bartender, Lori Suarez, call the police. Sanchez went outside to make sure the phone was not in the car.
David LeBlanc and Craig Robinson were together on the stage in the bar. LeBlanc was showing Robinson some techniques on the guitar. Although he was not on duty that night, Robinson was the manager of the bar, and often functioned as the "bouncer" and "peace keeper." They noticed their friends, Sanchez and Robert, having a discussion with three black men and saw the group approach the bar to talk to Lori Suarez. LeBlanc and Robinson walked toward the bar and heard a discussion about a cell phone. Kieff, who was also employed at the bar, walked in the bar during the discussion and asked Robinson what was going on. Robinson replied that he did not know but that it would "probably blow over." Meanwhile, Suarez asked the men if they had the phone, but the men maintained that they did not have the phone. The three men lifted their shirts and turned out their pockets to show they did not have the phone. Suarez told Robert to let the matter go and declined to call the police. After talking to Suarez, defendant and his friends walked out of the bar.
Robert followed the men out of the bar onto a landing that led downstairs to the parking lot. He was still talking about the cell phone. Kieff had just begun sipping the drink he ordered when Robinson tapped him on the shoulder to follow Robert outside in case there was trouble. LeBlanc walked behind Robinson and Kieff, who were standing on the landing at the top of the stairs. According to LeBlanc, Robert and Tremell were arguing. Kieff heard Robert say, "Look, man, all I want *98 is my phone back . . . The police are already on their way. If you have it, you know, they're going to know you have it. If you don't have it, then why can't you just wait until they just get here?" Tremell turned to walk away. When Robert reached out his arm to stop Tremell from leaving, Tremell turned around and punched Robert "very hard" in the face.
Tremell ran down the stairs with Robert chasing him. Robert jumped on his back and the two of them fell to the ground near the stairs. Robert put Tremell in a headlock and they wrestled on the ground. Kieff and Robinson ran down the stairs, and Robinson attempted to break up the fight. Kieff saw that defendant and Aaron were standing next to a car on the other side of the stairs. He told defendant, "Look, I'm trying to help your friend out so when I kneel down here, you know, don't come swinging at me. We're trying to help you out." According to Kieff, the men nodded or gestured that they were okay with that. Kieff then knelt down and assisted Robinson in attempting to make Robert release Tremell.
Sanchez stood in between the group on the ground and defendant and Aaron so that they would not jump in the fight. Sanchez told them, "Look, these guys work here. They're doing their job. They're trying to break up a fight." According to Sanchez, defendant reached into his pocket but raised his hands when Sanchez demanded to know what he was reaching for and told him to take his hands out of his pockets. When he heard Sanchez scream, Kieff turned and saw defendant's hand part of the way in his pocket. Kieff saw what appeared to be a black plastic object in defendant's hand, which he thought was a cell phone. Kieff told defendant that he didn't care if he had the phone but that he was just trying to break up the fight. When Kieff and Sanchez turned away, they heard something that sounded like firecrackers. Sanchez looked over and saw defendant's arm extended, with a gun firing toward his friends, and Sanchez leaped out of the way. Kieff looked up and saw Robinson with his back turned, falling down. Kieff then saw that Robert was shot. When Kieff lunged at defendant to stop the shooting, defendant shot him in the leg, and Kieff fell to the ground. Kieff realized that he had been shot in the chest when he sat up and began coughing up blood. After the shooting, Tremell got up and entered the car with defendant and Aaron. When Sanchez started yelling out the license plate number, the trio fled on foot.[1] At some point during the altercation, Kieff heard Tremell say something like, "He's killing me. . . . He's choking me. . . . Kill him," but said that it was hard to understand all of what Tremell had said.
LeBlanc observed the struggle and the ensuing shooting from the balcony. According to LeBlanc, neither defendant nor Aaron attempted to break up the fight. Rather, defendant extended his arm and fired the shots. LeBlanc drove around looking for the men to no avail. When he returned to the scene, it appeared that both Robert and Robinson were dead. Kieff had gunshot wounds to his chest and leg, but he was breathing.
Deputy George Giron of the Jefferson Parish Sheriff's Office was dispatched to Sharkey's at 3:45 a.m. After interviewing the witnesses, Deputy Giron broadcast a description of the fleeing suspects on the police radio. It was also determined that *99 the suspect vehicle, a blue Nissan Altima, was owned by the Barbarin family. The police ultimately located the three suspects in an apartment complex on Farmington Street, where Tremell's mother lived. At approximately 6:00 a.m., Sergeant Drury brought LeBlanc to the complex, where he identified the men as the three who had been at the bar earlier that morning. LeBlanc specifically identified defendant as the shooter. Sanchez also identified defendant as the shooter after viewing photographic lineups later that morning.[2]
The police were unable to locate the weapon used in the shooting. However, eight .40 caliber casings were recovered at the scene. It was stipulated that these casings were consistent with being fired from a Glock .40 caliber semi-automatic handgun and that the pattern of the casings found at the scene was consistent with being fired by a person standing near the right front door of the blue vehicle at the scene.
Defendant did not testify at trial, but his statement, which was recorded and transcribed, was admitted at trial. In the statement, defendant said that he descended the stairs of the bar, and Aaron and Tremell followed. He was about to enter the vehicle, but saw Tremell on the ground being choked by one of the white men who had been inside the bar. Defendant grabbed a Glock pistol, which defendant described as his "protection" and placed it in his pocket. Defendant claimed that he attempted to break up the fight and one of the guys grabbed him. Defendant said that he saw that his friend was hurt and could not breathe. According to defendant, "as he's being attacked I was being attacked too. So, I just defended myself and my friend . . . [b]y pulling out my pistol and I just let off a few shots." According to defendant, he fired the first shot when one of the guys grabbed him. Defendant said he was just shooting at the ground and was not trying to shoot anyone. After the shooting, they left they scene on foot because he could not find the car keys. Defendant claimed that he owned the gun but that he might have dropped it that night. In any event, defendant could not recall what happened to the gun. At trial, however, Lucien Barbarin testified that, at the time of the shooting, he owned a .40 caliber Glock handgun that he left in his aunt's car when he and defendant had been together the night before the shooting. Barbarin never saw the gun again after leaving it in the car.
Approximately a week after the shooting, Sanchez was playing in a pool tournament at Sharkey's when he found a cell phone in his pool case, which he reported to the police.

SUFFICIENCY OF THE EVIDENCE
On appeal, defendant contends that the evidence presented at trial was insufficient to support his convictions. Specifically, defendant argues that the state failed to prove he had the intent to kill or inflict great bodily harm with respect to the murder convictions, and that the state did not prove specific intent to kill as to the attempted murder conviction.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, *100 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
To prove second degree murder, the state was required to show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A)(1). To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death. LSA-R.S. 14:27; 14:30.1. While specific intent to inflict great bodily harm is sufficient to support a second degree murder conviction, attempted second degree murder requires a specific intent to kill. State v. Bishop, 01-2548 (La.1/14/03), 835 So.2d 434, 437.
Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from circumstances and actions of the accused, as well as the extent and severity of the victim's injuries. State v. Keating, 00-51 (La.App. 5 Cir. 10/18/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person. State v. Williams, 01-1650 (La.11/1/02), 831 So.2d 835, 849. "It is of no consequence whether defendant, in firing his weapon into a group of people, intended to hit one person or several people." See, State v. Severin, 04-326 (La. App. 5 Cir. 9/28/04), 885 So.2d 609, 617, which held the defendant had the requisite intent to support his convictions for second degree murder and attempted second degree murder after he fired shots in the direction of a group of people, where two individuals were wounded and one of them was killed.
In this case, the evidence reflects that defendant fired shots into a group of people, wounding one person and killing two others. The severity of the injuries inflicted to Kieff are indicative of defendant's intent to kill, and the severity of the wounds to Robert and Robinson are indicative of defendant's intent to kill or inflict great bodily harm. Robinson had two gunshot wounds to the back and one gunshot wound to the neck. One of the wounds was fatal, and the other wounds were potentially fatal. Robert had a fatal gunshot wound to the back of his head and one wound on his right foot where a gunshot grazed him. Kieff sustained a gunshot wound to his chest and to his thigh. Kieff lived, but only after suffering a collapsed lung and spending four days in the hospital, three of which were in intensive care.
The record does not reflect that his first shot was fired into the air, as defendant claims. Rather, the record reflects that David LeBlanc initially thought that defendant was firing into the air to stop the fight. LeBlanc realized that was not the case when Kieff and Robinson fell and Robert stopped moving.
The only evidence that defendant did not intend to kill or inflict great bodily harm is defendant's claim that he was firing at the ground. This claim is contradicted by the physical evidence. Defendant fired eight shots. The victims collectively sustained seven gunshot wounds. Thus, defendant missed striking a human being with only one of the shots that he fired. Based on the foregoing, we find that the evidence was sufficient to show that defendant had the requisite intent when killing Robert and Robinson and when attempting to kill Kieff.
*101 Nevertheless, defendant claims that his fear for the life of Tory Tremell was sufficient provocation to reduce the murder convictions to manslaughter, a lesser included verdict to second degree murder. According to LSA-R.S. 14:31, subd. A(1), manslaughter is a first or second degree murder that is
committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter; rather, they are mitigatory factors which may reduce the grade of the offense. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. State v. Johnson, 01-1362 (La. App. 5 Cir. 5/29/02), 820 So.2d 604, 610, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32. The question for this court on review, is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106, 111 (La.1986).
In the present case, we find that defendant did not meet his burden of proving that he acted in sudden passion or heat of blood. Rather, the evidence reflects that defendant deliberately entered his automobile, placed his weapon in his pocket, removed it and fired into a group of people, two of whom were trying to break up the altercation. Viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably found that the mitigatory factors were not established by a preponderance of the evidence.
The thrust of defendant's claim in these assignments is that the evidence supported a finding that his actions were justified because he acted in defense of Tory Tremell. According to LSA-R.S. 14:22, "[i]t is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person."
When self-defense or the defense of another is claimed by the defendant in a homicide case, the state has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense or in defense of another. State v. Rainey, 98-436 (La.App. 5 Cir. 11/25/98), 722 So.2d 1097, 1103, writ denied, 98-3219 (La.5/7/99), 741 So.2d 28. Regarding nonhomicide cases, this court stated in State v. Steele, 01-1414 (La.App. 5 Cir. 9/30/02), 829 So.2d 541, 547, writ denied, 02-2992 (La.9/19/03), 853 So.2d 632 and State v. Barnes, 491 So.2d 42, 47 (La.App. 5 Cir. 1986), that the defendant has the burden of proof by a preponderance of the evidence that his actions were in self-defense or in defense of others. However, other cases have evaluated the issue under the assumption that the state had the same burden as in homicide cases. See, State v. Agnelly, 515 So.2d 821, 823 (La.App. 5 Cir.1987); State v. Hidalgo, 95-319 (La. App. 5 Cir. 1/17/96), 668 So.2d 1188, 1198.
At this time, however, we need not revisit the issue of the applicable burden in non-homicide cases, because the evidence established beyond a reasonable doubt *102 that defendant did not kill in defense of Tremell. The evidence reflects that Tremell escalated the verbal argument with Robert into a physical altercation. Although Robert reached out to Tremell to stop him from leaving, Tremell threw the first punch, prompting Robert's reaction. The aggressor or the person who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. LSA-R.S. 14:21. Thus, it is questionable whether Tremell could have defended himself by using deadly force, since he had placed himself in the physical struggle with Robert.
In any event, the evidence reflects defendant could not have reasonably believed that his intervention by deadly force was necessary to save Tremell. Sanchez told defendant that Robinson and Kieff were just attempting to stop the fight. Kieff specifically told defendant and Aaron that he and Robinson were trying to help their friend, and they indicated their agreement to his involvement. However, according to Kieff, he and Robinson had only been trying for 20-30 seconds to break up the fight before defendant started shooting. Thus, defendant did not give Robinson or Kieff an opportunity to break up the fight. Further, while defendant claimed in his statement that he attempted to physically stop the fight, eyewitnesses testified that neither Aaron nor defendant tried to stop the fight.
By returning the guilty verdicts, the jury obviously rejected defendant's account of the events and found that defendant's actions were neither reasonable nor apparently necessary. It is the role of the fact-finder to weigh the credibility of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State v. Wallace, 00-1745 (La.App. 5 Cir. 5/16/01), 788 So.2d 578, 584, writ denied, 01-1849 (La.5/24/02), 816 So.2d 297. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that defendant had the requisite intent to support his convictions for attempted murder and second degree murder, and that defendant did not act in defense of Tremell. Based on the foregoing discussion, we find that the arguments raised by defendant in this assignment of error are without merit.

ERROR PATENT DISCUSSION
We have also reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). We note that while the commitments show that defendant was advised of the prescriptive period for filing post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8, the transcript does not. Generally, when there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Thus, the trial court is hereby instructed to inform defendant of the two year prescriptive period by sending written notice to defendant within ten days of the rendition this opinion and to file written proof in the record that defendant received such notice. State v. Miller, 02-729 (La.App. 5 Cir. 12/30/02), 836 So.2d 614, 618, writs denied, 03-0200 (La.10/10/03), 855 So.2d 326 and 03-0503 (La.10/10/03), 855 So.2d 329.
Accordingly, for the reasons set forth herein, defendant's convictions and sentences are affirmed, and the matter is remanded with instructions.
*103 CONVICTIONS AND SENTENCES AFFIRMED, MATTER REMANDED WITH INSTRUCTIONS.
NOTES
[1] LeBlanc's testimony corroborated the account of these events given by Sanchez and Kieff.
[2] At trial, defendant stipulated that his identity was not a contested issue in the case.