968 So.2d 766 (2007)
STATE of Louisiana
v.
Shannon BROWN.
No. 07-KA-228.
Court of Appeal of Louisiana, Fifth Circuit.
September 25, 2007.
*768 John M. Crum, Jr., District Attorney, Rodney A. Brignac, Assistant District Attorney, Fortieth Judicial District, Parish of St. John the Baptist, Edgard, LA, for Appellee, State of Louisiana.
Bruce G. Whittaker, Attorney at Law, Louisiana Appellate Project, New Orleans, LA, for Appellant, Shannon Brown.
Shannon Brown, Angola, LA, In Proper Person.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
On June 9, 2004, the grand jury for St. John the Baptist Parish indicted Shannon Brown, along with co-defendant, Wendell James, for first degree murder, in violation of La. R.S. 14:30(A)(1). Shannon Brown pled not guilty on June 14, 2004. On September 19, 2006, the District Attorney's Office for St. John the Baptist Parish amended the indictment to charge both defendants with second degree murder in violation of La. R.S. 14:30.1. Shannon Brown was re-arraigned and pled not guilty to the amended charge.
On September 19, 2006, trial of the charge against Shannon Brown commenced. On September 21, 2006, the 12-person jury found defendant guilty as charged.
On November 8, 2006, the trial court denied defendant's motion for new trial and sentenced defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. This timely appeal follows.
FACTS
On the evening of April 9, 2004, Ronald Dunn, Jr., Pettus Prine, Charles Palmer, Nathaniel Hall, Darrin Dillion, Von Dunn and Lionel Griffin were visiting their friend, Donovan Bailey, at his house on East Twenty-fourth Street in Reserve, Louisiana. As the group stood talking in Bailey's front yard, Donovan Bailey pointed out an older model, yellow Buick that was approaching the group from Sweet Lorraine Street, which connects Twenty-fourth and Twenty-fifth Streets. Ronald Dunn recognized the car from previous encounters with its occupants.
Ronald Dunn testified that, as the car approached them, he recognized Shannon Brown, who is also known as "Shane Brown," seated on the passenger side of the car. According to Ronald Dunn, he and Brown stared at each other as the car slowly passed by.[1] Ronald Dunn testified that Brown turned his head and grabbed a gun from inside the car. Ronald, who was distracted by warning his mother of possible danger, then heard shots fired at the group and ran away. Ronald did not see who fired the shots but testified that it sounded like the shots came from the passenger side of the yellow car. At trial, Ronald identified the defendant as the passenger of the yellow car who he saw with a *769 gun immediately before shots were fired at his group.
Von Dunn stated that he knew Brown because Brown had given him a ride in the past. Von Dunn saw defendant fire shots at his group of friends on the night of April 9, 2004. At trial, Von Dunn identified the defendant as the passenger of the yellow car who fired shots at his group.
Nathaniel Hall, Jr. testified that, Brown, who was the passenger of a slow-moving yellow car, was hanging out of the car window, shooting at him and his friends on April 9, 2004. He testified that he saw defendant fire the first shot. At trial, Hall identified the defendant as the passenger of the yellow car who fired shots at his group.
Pettus Prine testified that, on April 9, 2004, he was in front of Donovan Bailey's house sitting and talking with his girl-friend in her car when he noticed a yellow car moving slowly towards them on the street. He testified Brown, the passenger of the slow-moving car, was "fussing." Pettus Prine saw Brown put his head out of the car window with a pistol in his hand and shoot into the crowd; Prine saw defendant fire the first shot. Pettus Prine knew Brown prior to the incident from school. At trial, Prine identified the defendant as the passenger of the yellow car who fired shots at his group.
Donovan Bailey testified he saw the yellow car coming down the street and recognized it from an incident his friends had been involved in two nights ago. According to Donovan Bailey, defendant and Ronald Dunn made eye contact and, as the car moved slowly, defendant stuck his head out of the car window and said something to Ronald Dunn. Bailey then saw defendant pull his head back into the car and reach for something in the car. Donovan Bailey did not see defendant fire the shots but heard shots come from the passenger side of the car. At trial, Bailey identified the defendant as the passenger of the yellow car. At trial, Ronald Dunn, Von Dunn, Nathaniel Hall, Pettus Prine, and Donovan Bailey all testified that no one from their group had a weapon that night.
After the car left the scene, the group members saw Lionel Griffin lying in the street, bleeding from his head. Although Lionel Griffin was rushed to the hospital, the damage from the wound was too severe and he did not survive. The Jefferson Parish Coroner determined that Lionel Griffin died as a result of a gunshot wound to his head.
Michael Davis of the St. John Parish Sheriff's Office testified that he took photographs and collected evidence from the scene of the shooting. He identified photographs from the scene of a vehicle that was struck by a bullet.
Davis testified that, from the scene, he recovered five spent casingsthree 9mm casings and two .45 caliber casings. He testified that the casings were in the general proximity of each other, much less than 200 feet. He also attended the autopsy and collected the copper-jacketed bullet that was removed from the victim's head.
Davis stated that he could not determine when the casings that he recovered at the scene were fired or the order in which they were fired. Further, no detectable DNA was lifted from any of the casings. Michael Davis agreed that the evidence could indicate that more than one person was firing at the scene. Based on the evidence presented to him, Michael Davis was unable to determine who fired the shots in question.
Deputy Brian White of the St. John the Baptist Parish Sheriff's Office was the responding officer to the shooting. Deputy White prepared a report on the date of the *770 incident, which included approximate distances from which evidence was collected in relation to the victim's body. He reported that he saw three 9mm spent casings approximately 68 feet from the victim's body but on the opposite side of the road from the Bailey residence. Deputy White found two .45 caliber casings approximately 268 feet from the victim but on the same of the road as the residence.[2]
Patrick Lane, an expert in the field of firearms identification, testified that the badly-damaged, copper-jacketed bullet fragment extracted from the victim at the Jefferson Parish morgue was most consistent with a .45 caliber firearm. He examined two .45 caliber casings and determined they were all fired from the same firearm. He also testified that there were sufficient markings on each of the three 9mm cartridge casings to be able to establish that they all were fired from the same firearm. Patrick Lane testified that there were at least two different guns of different calibers that fired those casings on April 9, 2004.
Detective Lieutenant Kenneth Mitchell of the St. John the Baptist Parish Sheriff's Office, the case officer involved in this investigation, testified that when he arrived at the scene, Deputy Brian White indicated to him that there was a shooting and the victim was being transported to the hospital. Detective Mitchell observed three spent 9mm casings and two .45 caliber casings some distance away. He also observed a vehicle with a bullet hole in its front bumper.
Immediately after leaving the scene, Detective Mitchell interviewed Darrin Dillion, Donovan Bailey, and Von Dunn, who all identified Shannon Brown as the passenger of the yellow car who opened fire on them. Detective Mitchell interviewed Ronald Dunn, who said that shots came from the passenger side of the vehicle. According to Detective Mitchell, Von Dunn said he saw shots coming from both the passenger side and the driver side of the car.
A couple of days after the shooting, Detective Mitchell interviewed Nathaniel Hall and Pettus Prine, who both stated that they were standing with their friends in Donovan Bailey's front yard when a yellow vehicle passed by the house. They stated that the passenger opened fire on them. They both identified defendant as the shooter.
On the day after the shooting, Detective Mitchell interviewed Shannon Brown at the sheriff's office. Brown was advised of his rights and questioned as a suspect in the shooting. Defendant denied leaving his house on Friday, April 9, 2004.
Subsequently, Detective Mitchell presented a photographic lineup that included defendant to various witnesses. Von Dunn, Donovan Bailey, Darrin Dillion, Pettus Prine, and Ronald Dunn identified defendant from the lineup as the shooter.
At trial, the defense presented testimony from co-defendant, Wendell James. James stated that, on April 9, 2004, he was driving defendant home and defendant asked to stop at someone's house on Twenty-fifth Street in Reserve, Louisiana.[3] When James and Brown learned that the person was not home, they decided to take Twenty-fourth Street to return to Airline Highway. On Twenty-fourth Street, *771 James and Brown encountered a group of males on the side of the road who tried to block the road as they approached.
According to Wendell James, a light-colored male started shooting at his car. Wendell James said that the defendant shielded James from the shots with his body. Further, defendant immediately told James to leave the area, stuck his hand out of the car window, and shot back two times. James stated that the light-colored male shot first and defendant retaliated to protect them. James testified that bullets hit the side of his car, but, upon cross examination, he admitted that he no longer possessed the car because he gave the car to the defendant after the incident. Wendell James denied shooting at anyone.
At trial, Wendell James said that he did not know if defendant had "bad blood" with the people in the street. Finally, Wendell James admitted that he lied to Detective Mitchell in their initial interview when he said that he spent the night at defendant's house, never left the house on Friday, April 9, 2004, and never drove a yellow Buick.
LAW AND ARGUMENT
In his first two assignments of error, defendant challenges the sufficiency of the evidence.[4] Defendant specifically argues that the evidence was insufficient to support the verdict as it failed to prove beyond a reasonable doubt that the homicide was not done in self-defense and, further, that the evidence was insufficient to support a verdict of guilty as charged as it proved at best that the killing was a manslaughter done in the heat of passion as a result of a confrontation brought on by the gang lurking in front of Donovan Bailey's residence.
On appeal, defendant contends that the homicide was justifiable because he fired in self-defense.[5] Defendant argues that this Court must reverse his conviction because no rational fact finder could have concluded on the evidence presented at trial that the State proved beyond a reasonable doubt that the killing was not justified as an act of self-defense.
Defendant argues that if his theory of self-defense is rejected, this Court should find that the mitigatory factors mandating a verdict of manslaughter were established. Defendant claims his actions were in the heat of blood and were in response to the gang's provocative behavior.
The appropriate standard of review for determining the sufficiency of the evidence was established in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). According to Jackson, supra at 319, the reviewing court must decide, after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See also, State v. Holmes, 98-490 (La.App. 5 Cir. 3/10/99), 735 So.2d 687, 690.
Evidence may be either direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05-59 (La.App. 5 Cir. 5/31/05), 904 So.2d 830, 833. When circumstantial evidence is used to prove the commission *772 of an offense, La. R.S. 15:438 provides that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208.
This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. Id. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id. The credibility of a witness is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056.
In the present case to obtain a conviction for second degree murder, the State was required to prove (1) the killing of a human being, and (2) that the defendant had specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1 A(1); State v. Pagan, 04-1478 (La.App. 5 Cir. 5/31/05), 905 So.2d 435, 441, writ denied, 05-2003 (La.2/17/06), 924 So.2d 1013.
Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). The determination of specific criminal intent is a question of fact. State v. Gant, 06-232 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111, writ denied, 06-2529 (La.5/4/07), 956 So.2d 599. Specific intent may be inferred from the circumstances and from the defendant's actions, and the intent to kill or to inflict great bodily harm may be inferred from the extent and severity of the victim's injuries. Id. "The act of aiming a lethal weapon and discharging it in the direction of the victim supports a finding by the trier of fact that the defendant acted with specific intent to kill." Id. "It is of no consequence whether defendant, in firing his weapon into a group of people, intended to hit one person or several people." See, State v. Severin, 04-326 (La.App. 5 Cir. 9/28/04), 885 So.2d 609, 617, writ denied, 04-2805 (La.3/11/05), 896 So.2d 64.
Defendant contends the homicide was justifiable because the shooting was committed in self-defense. According to La. R.S. 14:20(1), a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." When a defendant claims self-defense in a case such as the present case, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. State v. Cazenave, 00-183 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01), 799 So.2d 1151.
The relevant inquiry on appeal is whether a rational fact finder, after viewing the evidence in the light most favorable to the prosecution, could have found, beyond a reasonable doubt, that the homicide was not committed in self-defense. The determination of Defendant's culpability focuses on a two-fold inquiry, whether, from the facts presented, Defendant could reasonably have believed his life to be in imminent danger, and whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a Defendant had a reasonable *773 belief that deadly force was necessary to avoid the danger.
Id. at 860.
Our review of the trial testimony reveals that, according to Ronald Dunn and Donovan Bailey, the first shot fired was from the direction of the yellow car, not from anyone in their group. According to Von Dunn, Nathaniel Hall, Pettus Prine, Shannon Brown fired the shots at their group from the passenger side of the yellow car. Further, Ronald Dunn, Donovan Bailey, Von Dunn, Nathaniel Hall, and Pettus Prine testified that they did not see any-one in their group with a gun or weapon and that no one in their group fired a gun at anytime that night. When interviewed initially, defendant stated he did not leave his house the day of the incident. Detective Mitchell testified that defendant never said someone shot at him or the car he was in while he was interviewed.
Defendant argues that the physical evidence supports his claim of self-defense and impeaches the State's witnesses. Specifically, he argues the victim's body with the .45 caliber bullet was found in front of the residence and that the 9mm casings were only 68 feet away. He adds that the .45 caliber casings were 268 feet away, arguing that this demonstrates the victim died in a shoot-out involving a 9mm from the crowd and a .45 caliber firearm responding from the vehicle.
At trial, Michael Davis stated that he could not determine when the casings that he recovered were fired. Detective Mitchell stated that it was possible for one person to shoot two guns in succession and for two people to be shooting two guns out of the same vehicle. He explained that Von Dunn indicated shots were being fired from the driver's side and the passenger side of the yellow car, which would also be consistent with the evidence on the scene of the crime. Detective Mitchell agreed there was no evidence that any shots came from any location other than the yellow vehicle. We find no error in the jury's apparent determination that defendant shot first and not in self-defense as alleged.
Defendant argues, next, that the evidence only supports a conviction of manslaughter. According to La. R.S. 14:31 A(1), manslaughter is a homicide which would be first or second degree murder, but the homicide is
committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]
"Sudden passion" and "heat of blood" are not elements of the offense of manslaughter. Instead, they are mitigatory factors which may reduce the grade of the offense. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a pre-ponderance of the evidence. State v. Barbarin, 04-1094 (La.App. 5 Cir. 3/1/05), 900 So.2d 95, 101. The question for this Court on review, is whether a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Id., (citing State v. Lombard, 486 So.2d 106, 111 (La.1986)).
Defendant claims that the location of the spent casings supports a finding that defendant's actions were in self-defense. Defendant contends the victim's gang was partially blocking the street as they were driving by and fired a 9mm weapon. He *774 claims that defendant responded with heat of blood to the gang's behavior by firing a .45 caliber weapon out of the window.
In the present case, the jury did not find that defendant established the mitigatory factors of "sudden passion" and "heat of blood" by a preponderance of the evidence. Our review of the record reveals that the finding was reasonable because the evidence presented at trial reflects that defendant deliberately fired a gun from a moving vehicle into a group of people. Further, the evidence did not support a finding that the defendant fired at the group in "sudden passion" or "heat of blood" since the State's witnesses testified that the defendant rode by "fussing" at the group, opened fire on the group, and that no one in their group fired a weapon at the defendant's vehicle at any time on the night of the incident. Viewing the evidence in the light most favorable to the prosecution, the jury could have reasonably found that the mitigatory factors of "sudden passion" and "heat of blood" were not established by a preponderance of the evidence.
In his third counseled and his first pro se assignment of error, defendant argues that the court should have declared a mistrial in view of the State's wholly improper closing argument reference to appellant's failure to testify at trial. Defendant argues the State's repeated, direct, and improper reference to his failure to testify during its closing argument was so prejudicial as to warrant a mistrial. He argues the trial court erred in denying his request for a mistrial and that such error requires reversal.
Defendant challenges the following comments made by the State during rebuttal argument which he contends involve defendant's failure to testify at trial:
Ladies and gentlemen, my argument to you is that there is a certain intellectual dishonesty, if you will, about a defense that comes in and says it's not me, it's not my client, my client wasn't shooting, but if it turns out that my client was shooting, if it turns out that it was him the passenger, then it was self defense [sic].
Defense counsel objected. The prosecutor also stated, "The way to present self-defense is to be up front and say, yes, I was there . . . yes, I did the shooting." The prosecutor continued with the following comment: "Now, the way to present self-defense is to be straight up front. Yes, I did the shooting but the guy was threatening my life. He was threatening me with serious bodily harm. I had to shoot him, I had no alternative."
The defense moved for a mistrial, noting that the State's argument constituted a comment about defendant not testifying and argued the State was attempting to shift the self-defense burden. The trial court denied the motion and gave an admonition to the jury, telling them to disregard the State's statement since they could not consider the fact defendant was not testifying.
"Whether a mistrial should be granted is within the sound discretion of the trial court and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of discretion." State v. Steele, 01-1414 (La.App. 5 Cir. 9/30/02), 829 So.2d 541, 549, writ denied, 02-2992 (La.9/19/03), 853 So.2d 632. "Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the . . . district attorney . . . in argument, refers directly or indirectly to . . . [t]he failure of the defendant to testify in his own defense[.]" La.C.Cr.P. art. 770(3). Additionally, La. C.Cr.P. art. 770 provides that "[a]n admonition to the jury to disregard the remark *775 or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial."
The granting of a mistrial based on the State's direct or indirect reference to the defendant's failure to testify in his own defense is a prohibition that was established to safeguard the defendant's Fifth Amendment right against self-incrimination. State v. Mims, 00-1507 (La.App. 5 Cir. 12/26/01), 806 So.2d 760, 764, writ denied, 02-0466 (La.2/7/03), 836 So.2d 88.
When the State makes a direct reference to the defendant's failure to take the stand, a mistrial should be declared, and "it is irrelevant whether the prosecutor intended for the jury to draw unfavorable inferences from defendant's silence." State v. Johnson, 541 So.2d 818, 822 (La. 1989) (quoting State v. Fullilove, 389 So.2d 1282, 1284 (La.1980)). The Louisiana Supreme Court further noted the following:
Where the reference to the defendant's failure to take the stand is not direct, this Court will inquire into the remark's "intended effect on the jury" in order to distinguish indirect references to the defendant's failure to testify (which are impermissible) from general statements that the prosecution's case is unrebutted (which are permissible).
Id.
The Louisiana Supreme Court in State v. Johnson also set forth the test for determining the "intent" of such a statement:
In cases where the prosecutor simply emphasized that the state's evidence was unrebutted, and there were witnesses other than the defendant who could have testified on behalf of the defense but did not do so, we have held that the prosecutor's argument did not constitute an indirect reference to the defendant's failure to take the stand.
On the other hand, where the defendant is the only witness who could have rebutted the state's evidence, "a reference to the testimony as uncontroverted focuses the jury's attention on the defendant's failure to testify" and mandates a mistrial.
Id. at 822-823 (internal citations omitted). "In order to support the granting of a mistrial, the inference must be plain that the remark was intended to focus the jury's attention on the defendant's failure to testify." State v. Mims, 806 So.2d at 764.
In the present case, we find that the comments were neither a direct reference nor an intended indirect reference to the defendant's failure to testify in his defense. The scope of argument is provided for in La.C.Cr.P. art. 774, which provides the following:
The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.
The argument shall not appeal to prejudice.
The state's rebuttal shall be confined to answering the argument of the defendant.
In his closing argument, defense counsel argued was that the homicide was committed in self-defense. In this case, we find that the State's comments were an attempt to explain the law regarding self-defense to the jury in response to the defense's closing argument. Accordingly, we find that the trial court did not err in denying defendant a mistrial.
In his last pro se assignment of error, defendant argues that the State's failure to disclose pictures of the victim *776 prior to trial resulted in an unfair trial. Defendant argues that the State failed to disclose photographs of the victim prior to trial, prejudicing the defense and resulting in an unfair trial. Defendant argues although the photographs were requested for several months, they were not shown to the defense until the day of trial. Defendant challenges a photograph of the victim during the autopsy "with the brain cavity held open pointing to a location where the bullet was found, and two other bloody pictures[.]" Defendant further contends the State did not present a valid reason for using the gruesome photographs and that their probative value were of minimal value. Defendant argues the photographs were clearly prejudicial and inflammatory and their introduction into evidence caused reversible error.
Our review of the trial transcript and appellate record reflects that only one photograph of the victim that was admitted into evidence at trial. Upon review, we note that this photograph does not meet the description of the autopsy photograph being challenged nor the "two other bloody pictures" described by the defendant. Defendant does not challenge the photograph that was admitted into evidence. This assignment of error, therefore, does not present an issue for our review.
As is our routine practice, we have reviewed the record for errors patent in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990). We have found no error requiring corrective action. Defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] At the same time, Ronald Dunn saw his mother, Elaine Dunn, driving her car toward the group, approaching the yellow car from the rear. Because Ronald thought that Brown might shoot, he shouted to his mother to leave the area.
[2] Michael Davis, who actually collected the evidence, reviewed Deputy Brian White's report and believed that the distance between the two sets of casings was substantially shorter.
[3] James testified that the car belonged to him even though it was registered in another person's name.
[4] For clarity, the discussion of these assignments has been combined.
[5] In this case, defendant does not argue that the State failed to prove that he fired a weapon out of the vehicle. In fact, at trial, his counsel elicited testimony from its own witness, co-defendant, Wendell James that defendant fired shots from the vehicle.