CLARENCE E. McMANUS, Judge.
 

 |2The defendant, Bobby Terrell, was convicted of one count of attempted second degree murder of Kerry Armstrong, a violation of LSA-R.S. 14:30.1(14:27), and was sentenced to ten years at hard labor with credit for time served. The defendant takes this timely appeal.
 

 On December 5, 2007, defendant shot Kerry Armstrong, during an altercation between the two men. Armstrong was shot four times and suffered injury to his hand and chest, and underwent surgery for a collapsed lung.
 

 At trial, defendant contended first that he did not intend to shoot Armstrong and second that he acted in self-defense.
 

 The testimony at trial established that during the afternoon of December 5, 2007, Armstrong
 
 [1]
 
 encountered the defendant, whom he learned was with Ashton Lee, the person Armstrong stated had killed his (Armstrong’s) younger brother. Armstrong told the defendant that he was wrong for being with Ashton and bringing him around. Then, they had a fistfight for five minutes. Armstrong admitted that he started the fight. According to Armstrong, after a female companion broke up the fight, he and the defendant left. Armstrong testified that |3he thought that the defendant ran away to get a gun. Armstrong testified that he did not intend to try to kill the defendant, and he denied telling the defendant that he was going to kill him. Rather, Armstrong agreed that, he told the defendant not to be caught around Ashton Lee, in St. Rose. Armstrong testified that he was not carrying a gun on the day of the incident, and that he has never owned, carried, or held a gun.
 

 The defendant testified that, on December 5, 2007 at approximately 2:30 p.m., he was near his home when Armstrong got out of a vehicle and ran towards him. According to the defendant, Armstrong had an evil look on his face and said, “ ‘Yeah, yeah. I heard who you was with. You was chilling with the nigger Ashton that killed my brother.’ ” According to the defendant, he did not say anything to Armstrong before Armstrong struck him. The defendant testified that they started fighting, and then Armstrong “clipped [him] on the ground.” The defendant testified that,
 
 *248
 
 two or three minutes later, a woman pulled Armstrong off him. Then, Lamar Nar-cisse, Armstrong’s cousin, got out of the vehicle and ran towards the defendant. The defendant testified that he got off the ground and ran away. According to the defendant when the fight was over, Armstrong said, “‘Yeah. I catch you Ashton [sic], next time, I’m going to kill you.’ ” The defendant testified that he armed himself with an unregistered gun because he was scared after the fight in which Armstrong had threatened him. According to the defendant, he had no doubt that Armstrong was serious and meant what he said.
 

 Armstrong testified that, later that same day, he stopped at the Quick and Fast, while riding around with his cousin, Earnest Batiste, and a friend, Erin Carter. Armstrong testified that when he was leaving, while two or three steps from the door, the defendant was walking inside the store. According to Armstrong, they Lwalked right into each other, and then they both started fighting again. Armstrong testified that he was punching the defendant when he heard six shots fired. According to Armstrong, he was unconscious for five or ten seconds, and then he heard someone say, “Now, nigger, now.” Armstrong testified that when he came to his senses, he opened his eyes and saw that the defendant had shot him in his right hand, his dominate hand. Armstrong testified that the defendant shot him, and that he saw the gun in the defendant’s right hand.
 
 [2]
 
 Armstrong described his hand as “tor[n] off.” He only felt the thumping of his hand. At some point, Armstrong also realized that the defendant also shot him in the chest. When asked, if “[his] sole belief for thinking that Beau
 
 [3]
 
 shot you or [the defendant] shot you is that you were shot, right?,” Armstrong replied, “Who else going [sic] to shoot me?”
 

 Armstrong testified that he ran out of the store in a direction to avoid the defendant’s parked car. Subsequently, he saw the defendant get into his car and drive away. He returned to the store, where he encountered Aneika Moliere, and requested that she take him to the hospital. Moliere testified that when Armstrong approached, he ran towards her holding his chest with a bloody hand that Moliere described as, “like blown off.” When Armstrong took off his shirt in her vehicle, she observed wounds on his chest and a hole in his side.
 

 Ha Bui, the manager of the Quick and Fast on River Road, in St. Rose, testified that, on the day of the incident, Armstrong came into the store with another man that he had seen in the store before, as a customer. Bui described the subsequent events, as follows:
 

 Next thing I know, I think [the defendant] came in right to the front of the store, and before I know it, I just saw a turn — -I was kind of |Bhelping the other customers, but a glimpse, I saw [Armstrong] had turned toward the other guy and kind of like they were — next thing you know they were fighting on the ground.... And the next thing I know, I heard, you know, shots fired, and I just ducked behind the counter. And that was it.
 

 Later, in his testimony, Bui again stated, “the next thing you know [the defendant] walked in, and then he turned to look at
 
 *249
 
 him or whatever, and like I said, they were — they started fighting right there.”
 

 When asked to describe the position of Armstrong and the defendant on the floor, Bui replied, “It’s — from what I could see, it like [Armstrong] is on top of [the defendant].” Subsequently, when asked if Armstrong was on top of the defendant, Bui responded, “Like I said, it like whenever they started fighting, it just — it’s like one lunged toward [the defendant], [Armstrong] lunged toward [the defendant], and I guess he’s on top of him.”
 
 [4]
 
 According to Bui, he saw the fight between the defendant and Armstrong when it was initiated, and he never saw anyone else involved in the altercation.
 

 Bui testified that he heard three or four shots fired while the defendant and Armstrong were on the ground. According to Bui, the shots were fired approximately 30 seconds after the defendant entered the store. Bui also testified that he did not see the defendant with the gun nor did he see the defendant discharge the gun. Bui testified that when the police processed the scene at the store they found two bullets stuck in the ceiling/roof and four shell casings. According to Bui, he ánd the police also found pieces of flesh stuck to the roof and on the newspaper stand.
 

 The defendant testified that, on December 5th at approximately 6:00 p.m., sometime after his altercation with Armstrong, he decided to go to the Quick and Fast. The defendant testified that he did not know that Armstrong was inside the |0store when he entered. The defendant admitted a vehicle belonging to Armstrong’s cousin, Batiste, was outside the store. The defendant testified that when he entered the store someone other than Armstrong immediately hit him from the side. Then, Armstrong rushed towards him, began punching him, and knocked him to the ground. According to the defendant, he did not say anything to or make any gestures towards Armstrong before he was attacked. The defendant testified that Armstrong was on top of him, as he fought to defend himself from three men. The defendant testified that when the individuals started stomping on him, he fired his gun. According to the defendant, Armstrong was still on top of him at the time. The defendant testified that his eyes were closed when he fired the gun. The defendant claimed that he was not specifically aiming at Armstrong or anyone else. The defendant claimed that he did not think he would hit anyone when he fired the gun while it was on the ground. According to the defendant, he did not know how many shots he fired. The defendant testified that he fired his gun because he believed that “[Armstrong was going to kill [him] like he said earlier.” According to the defendant, he fired the gun out of fear, to stop the assault, and because it was necessary to protect his life. The defendant testified that he did not know whether Armstrong had a gun. The defendant responded negatively when asked if he knew that Armstrong had been shot. According to the defendant, he did not learn that Armstrong was shot until an hour and a half later. The defendant testified that, after the shooting, he dropped the gun in front of the store, when he tripped while running away. According to the defendant,' that was the last time he saw the gun. The defendant testified that he immediately left in his vehicle for Sli-dell because he thought he would be safe there.
 

 Detective Bass testified that, upon entering the Quick and Fast, he observed blood by the door and on a newsstand, as well as several shell casings on the floor.
 

 
 *250
 
 | yAccording to Detective Bass, no gun was recovered at the scene. Detective Bass testified that he viewed the video recording of the fight. However, part of the altercation occurred off camera. Detective Bass testified that he questioned a large group of people standing in the parking lot, and based on the information he received, he researched the defendant’s name.
 

 Detective Bass testified that subsequently the defendant’s silver Camaro was located at an address on Camelia Court, in Slidell, belonging to Ashton, Arrol, and Arcenniel Lee. Detective Bass testified that both Arrol and Arcenniel Lee told him that they had spoken directly to the defendant, and that the defendant was involved in an altercation with three people at the time of the shooting.
 
 [5]
 
 Detective Bass agreed that both Arrol and Arcenniel Lee stated that the defendant had discharged the gun without a particular target while being “stomped on.” Detective Bass also agreed that both Arrol and Arcenniel Lee stated that the defendant did not know if he had actually shot anyone. Detective Bass testified that Arcenniel Lee stated that the defendant told him that he dropped the gun at the front of the store.
 

 At trial, Arcenniel and Arrol Lee testified the defendant came to their house on the date of the incident, at approximately 6:00 p.m. or 7:00 p.m. Arrol, Ashton, and Arcenniel Lee all testified that they did not learn anything about the incident from the defendant. Arcenniel Lee admitted that he told the police that the defendant told him that Armstrong said that he was going to kill him. Detective Bass admitted that Arcenniel Lee told him that the defendant stated that Armstrong was going to kill him.
 

 Detective Bass admitted that his investigation did not find an eyewitness who saw the defendant with a weapon and, therefore, without the testimony of Arrol and Arcenniel Lee, there was no eyewitness evidence to suggest that the [^defendant was in possession of a gun. However, Detective Bass testified that he believed that the defendant shot Armstrong. Detective Bass oioined that the defendant was in possession of a gun based on the physical evidence collected at the Quick and Fast. Specifically, the four bullet holes in the ceiling, the four shell casings found on the floor, and the video recording that showed Armstrong on top of the defendant. In addition, Detective Bass opined that the defendant had the specific intent to kill Armstrong because of the physical evidence on the scene, the casings, the witnesses that saw the defendant enter the store, the short period of time the defendant was in the store, and the history between the defendant and Armstrong including the homicide of Armstrong’s brother. Detective Bass admitted that there was no evidence to contradict Bui’s statement that Armstrong was the aggressor, to suggest that the defendant said or did anything to Armstrong before the defendant was jumped, or that the defendant knew Armstrong was in the Quick and Fast.
 

 In his sole assignment of error, the defendant alleges that the evidence is insufficient to convict, in that the state failed to prove the requisite intent to kill. Furthermore, the evidence fails to negate his contention that he acted in self defense. The State argues that it presented evidence to prove that the defendant intended to kill Armstrong when he shot him four times,
 
 *251
 
 at point blank range, hitting him in the chest, stomach, and hand, and that the evidence presented proved that the defendant was not acting in self-defense.
 

 The standard of review for testing the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the State proved the essential elements of the crime-beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The evidence may be either direct or circumstantial. Both the direct 13and circumstantial evidence must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt.
 
 State v. Gant,
 
 06-232, p. 7 (La.App. 5 Cir. 9/26/06), 942 So.2d 1099, 1111,
 
 writ denied,
 
 06-2529 (La.5/4/07), 956 So.2d 599. “The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-R.S. 15:438. This statute does not establish a stricter standard of review than the more general rational juror’s reasonable doubt standard; rather it is merely an evidentiary guide for the jury when considering circumstantial evidence.
 
 State v. Manning,
 
 03-1982, p. 46 (La.10/19/04), 885 So.2d 1044, 1088,
 
 cert. denied,
 
 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005).
 

 In cases involving circumstantial evidence, the reviewing court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events.
 
 State v. Davis,
 
 92-1623, p. 11 (La.5/23/94), 637 So.2d 1012, 1020,
 
 cert. denied,
 
 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994); See also,
 
 State v. Gant,
 
 06-232 at 7, 942 So.2d at 1111. Rather, the reviewing court must evaluate the evidence in the light most favorable to the prosecution and determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under
 
 Jackson v. Virginia. Id.
 
 The reviewing court must not impinge on the jury’s finding of fact, in a criminal case, except to the extent necessary to guarantee constitutional due process.
 
 State v. Mitchell,
 
 99-3342, p. 7 (La.10/17/00), 772 So.2d 78, 83.
 

 The trier of fact’s rational credibility calls, evidence weighing, and.inference drawing are preserved, because the sufficiency inquiry does not require a reviewing court to ask itself whether it believes that the evidence at trial | i0established guilt beyond a reasonable doubt.
 
 State v. Mitchell,
 
 99-3342 at 8, 772 So.2d at 83. An appellate court does not evaluate the credibility of witnesses, nor should it overturn the trial court on its factual determination of guilt.
 
 State v. Addison,
 
 00-1730, p. 7 (La.App. 5 Cir. 5/16/01), 788 So.2d 608, 613,
 
 writ denied,
 
 01-1660 (La.4/26/02), 814 So.2d 549. Instead, the appellate court must assure that the jury did not speculate where the evidence is such that reasonable jurors must have a reasonable doubt.
 
 State v. Mitchell,
 
 99-3342 at 8, 772 So.2d at 83. The “ ‘appellate court is constitutionally precluded from acting as a ‘thirteenth juror’ in assessing what weight to give evidence in criminal cases; that determination rests solely on the sound discretion of the trier of fact.’ ”
 
 Id.
 
 citing
 
 State v. Azema,
 
 633 So.2d 723, 727 (La.App. 1 Cir. 12/29/93),
 
 writ denied,
 
 94-0141 (La.4/29/94), 637 So.2d 460.
 

 In order to prove second degree murder, the State was required to prove (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A)(1). In order to sustain a conviction for attempted second degree
 
 *252
 
 murder, the State must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim’s death. LSA-R.S. 14:27 and LSA-R.S. 14:30.1. In order to support an attempted second degree murder conviction, the State is required to prove a specific intent to kill.
 
 State v. Barbarin,
 
 04-1094, p. 8 (La.App. 5 Cir. 3/1/05), 900 So.2d 95, 100.
 

 “Specific intent is ‘that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.’ ”
 
 Id.;
 
 See also, LSA-R.S. 14:10(1). Specific intent is a state of mind; therefore, it need not be proven as a fact, but may be inferred from circumstances and actions of the accused, as well as the extent and severity of l^the victim’s injuries.
 
 Id.
 
 Specific intent to kill may be inferred from the defendant pointing a gun and firing at an individual.
 
 Id.
 
 Sufficiency of the evidence to support an inference of specific intent has been found, in most cases, where the proximity of the gunman to the victim when shot was fired was at close-range or point-blank.
 
 State v. Gant,
 
 06-232 at 8, 942 So.2d at 1111.
 

 In the present case, the defendant argues that the State failed to prove the requisite intent. The defendant claims that he was not the aggressor in the altercation. Rather, after his life previously had been threatened by Armstrong, he only shot the gun to defend himself because he was being beaten by Armstrong and two other men.
 

 Louisiana jurisprudence has long held that the defendant in a homicide prosecution who asserts that his actions were in self-defense does not have the burden of proof. Rather, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense.
 
 State v. Barnes,
 
 491 So.2d 42, 45-16 (La.App. 5 Cir.1986). This Court has held that, in a non-homicide case, it is the defendant who bears the burden of production of evidence in support of his affirmative defense of self-defense, as well as the burden of persuading the trier of fact of the existence of facts constituting the defense by a preponderance of the evidence.
 
 State v. Barnes,
 
 491 So.2d at 47. Cf:
 
 State v. Fluker,
 
 618 So.2d 459 (La.App. 4th Cir.1993), in which the Fourth Circuit stated that it was the state who bore the burden of disproving self-defense in both homicide and non-homicide cases. We note that there is a split in the circuits concerning this issue.
 

 More recently, in
 
 State v. Taylor,
 
 04-54 (La.App. 5 Cir. 4/27/04), 874 So.2d 297,
 
 writs
 
 denied, 04-1326 (La.11/08/04), 885 So.2d 1122 and 04-1495 (La.11/08/08), 885 So.2d 1120, this Court did not find it necessary to re-visit the issue of who bears the burden of proof in a non-homicide case because it found |i2that, in that case, a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could find that the State proved beyond a reasonable doubt that the defendant did not act in self-defense.
 
 Id.
 

 “[T]he lack of a weapon is not dispositive of the issue of self-defense, because it is the reasonableness of apprehension and not the actuality of danger that determines the question of self-defense.”
 
 Id.,
 
 quoting
 
 State v. Patorno,
 
 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141, 148. In addition, while there is no unqualified duty to retreat, the possibility of escape from an altercation is a recognized factor in determining whether the defendant had a reasonable belief that deadly force was necessary to avoid the danger.
 
 State v. Theriot,
 
 07-71 at 13, 963 So.2d at 1020. Also, the severity of the injuries to a surviving victim can be a factor in determin
 
 *253
 
 ing intent to kill.
 
 State v. Barbarin,
 
 04-1094 at 9, 900 So.2d at 100.
 

 In the present case, the State presented evidence that four casings were found, which indicated that the defendant fired four shots while Armstrong was on top of him. Armstrong sustained gunshot wounds to his chest and his right hand. Armstrong also suffered a collapsed lung and underwent surgery. The severity of the injuries inflicted upon Armstrong indicated the defendant’s intent to kill.
 

 Defendant claims that he closed his eyes when he fired the four shots and that he did not aim the gun at the defendant, which proves that he did not have the intent to kill. The defendant’s claim is contradicted by the physical evidence. In this case, the defendant fired four shots and Armstrong was the only person wounded by the shots. Armstrong was on top of the defendant when he fired the shots, and all four shots were fired in the direction of Armstrong towards the ceiling. Two projectiles were found in the ceiling, and it appears that the other two projectiles continued through the roof.
 

 | KjThe jury is the ultimate fact-finder in determining whether a defendant proved his condition, i.e., self-defense, and whether the state negated the defense beyond a reasonable doubt.
 
 State v. Theriot,
 
 07-71, p. 13 (La.App. 5 Cir. 6/26/07), 963 So.2d 1012, 1020,
 
 -unit denied,
 
 07-1598 (La.2/1/08), 976 So.2d 715.
 

 In order for an appellate court to reverse a conviction based on an alternative hypothesis of innocence, the appellate court must find that the jury could not have negated the potential alternative hypothesis for the defendant’s actions because specific intent to kill was not proven.
 
 State v. Mitchell,
 
 99-3342 at 7, 772 So.2d at 83.
 
 (See, State v. Mitchell,
 
 in which the defendant argued that he lacked the requisite specific intent to kill based on an alternative hypothesis involving self-defense.
 
 State v. Mitchell,
 
 99-3342 at 8, 772 So.2d at 83-84.) An appellate court cannot assume a reasonable alternative hypothesis exists when the jury has heard evidence of specific intent to kill to negate the alternative hypothesis.
 
 State v. Mitchell,
 
 99-3342 at 8, 772 So.2d at 83.
 

 We therefore find that the evidence was sufficient for a rational trier of fact to find beyond reasonable doubt that defendant had the requisite intent when attempting to kill Armstrong. Even assuming that the State bore the burden of proving that the defendant did not act in self-defense, the jury, viewing the evidence in the light most favorable to the prosecution, could have found that the State proved beyond a reasonable doubt that the defendant did not act in self defense. The only evidence presented concerning the defendant’s claim that he acted in self-defense is the defendant’s testimony that Armstrong threatened his life prior to the shooting. At trial, Armstrong admitted that he had a five-minute fistfight with the defendant, which he started. But, Armstrong denied threatening to kill the defendant during the fight. Instead, Armstrong testified that he told the defendant not to be caught around Ashton Lee, in St. Rose. According to ] 14Armstrong, he did not intend to try to kill the defendant. In fact, Armstrong testified that he thought that the defendant had run away in order to get a gun during the first altercation. Thus, the jury could have found that the evidence as presented by the state negated the defense of self-defense beyond reasonable doubt. We find no merit to the defendant’s assignment of error.
 

 We have reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975);
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5
 
 *254
 
 Cir.1990), and find none which warrant corrective action.
 

 Accordingly, defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Armstrong admitted that he had two convictions for possession of cocaine, and that he was currently serving a five year sentence on a revocation by the drug court for failing to meet the standards, i.e., using drugs and failing to obtain employment. Armstrong admitted that he had crack cocaine and $400 on him when he was shot. Armstrong also admitted to dealing drugs to support his habit.
 

 [2]
 

 . Detective Bass, investigating officer, testified that Armstrong told him that he did not see gun. He only heard the shots.
 

 [3]
 

 . According to Armstrong, the defendant's nickname is Beau.
 

 [4]
 

 . Detective Bass testified that Bui told him that the defendant punched Armstrong.
 

 [5]
 

 . Detective Bass testified that the videotape and the testimony of Bui contradicted their statements.